[No. A104681. First Dist., Div. Three. Jan. 11, 2006.]

JOHN P. STREBEL, Plaintiff and Appellant v.
BRENLAR INVESTMENTS, INC., et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, Rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I.3., I.4., and II.

## COUNSEL

Law Offices of Jeffrey J. Allen, Jeffrey J. Allen; Law Office of Rose M. Zoia and Rose M. Zoia for Plaintiff and Appellant.

Law Offices of Albert E. Cordova, Albert E. Cordova; Law Offices of Daniel U. Smith, Daniel U. Smith and Ted W. Pelletier for Defendants and Appellants.

June Babiracki Barlow and Grant M. Habata for California Association of Realtors as Amicus Curiae on behalf of Defendants and Appellants.

## OPINION

**POLLAK, J.**—This case questions the proper measure of damages when a fiduciary fraudulently induces the sale of real property to a third party by failing to disclose a material fact unrelated to the value of the property. Defendants Brenlar Investments, Inc., doing business as Frank Howard Allan (Brenlar) and its agent Haya Smith appeal from a $305,000 judgment against them entered on plaintiff John P. Strebel's complaint for real estate fraud. Defendants concede that substantial evidence supports the jury's findings that Smith concealed information about the salability of a house in Sonoma County that Strebel had agreed to purchase, and that Strebel sold his house in the City of San Bruno believing that escrow on the Sonoma County house would soon close. Defendants challenge the court's rulings with respect to Strebel's damages, arguing, among other things, that the court erroneously permitted the jury to include lost appreciation in the value of the San Bruno home and lost use of the San Bruno property in the measure of recovery. While we reject these contentions in the published portion of this opinion, in the unpublished portion we conclude that there must be stricken from the judgment $52,727, the amount by which the verdict exceeded the economic damages to which Strebel's expert testified, and $50,000 awarded for emotional distress arising from defendants' negligence.

Strebel has filed a cross-appeal in which he contends that the court erred by dismissing the jury before it reached a verdict on punitive damages. In the unpublished portion of this opinion, we also conclude there was no abuse of discretion in finding that Strebel failed to subpoena Brenlar's financial documents in a timely manner and therefore was unable to present any evidence of Brenlar's financial worth in support of his claim for punitive damages. Accordingly, we shall reduce the judgment by $102,727 and affirm the judgment in all other respects.

## Factual and Procedural History

On August 5, 1999, Strebel entered into a contract to buy a house in Sonoma County from Jon and Laurie Steel for $420,000. Unbeknownst to Strebel, the Sonoma house was encumbered with tax liens and judgments that exceeded the agreed-upon purchase price. Smith, acting as a dual agent for the buyer and sellers, was aware of the tax liens but concealed that information from Strebel. On August 25, 1999, the Steels wrote to Smith, explaining that they had made an offer in compromise to the Internal Revenue Service (IRS) to reduce the tax liens, but that if the offer was rejected they would be unable to transfer title to Strebel. Smith did not convey this information to Strebel. Instead, when Strebel learned of the tax liens, Smith told him the Steels were working on reducing the liens, which would not be a problem. Three days later Smith again reassured Strebel that the Steels were "taking care of it and escrow would close; they were moving forward with the transaction."

In the meantime, Strebel was making preparations to sell his home in San Bruno. Strebel entered into a contract to sell the San Bruno property in mid-August for $424,950. The sale was contingent on the Sonoma escrow proceeding. Strebel immediately told Smith that he had sold the San Bruno home and that escrow was set to close September 3. After receiving assurances from Smith that the Sonoma purchase was on track, Strebel closed escrow on the sale of his San Bruno house as scheduled and moved his personal property to a storage unit in Sonoma. Strebel netted approximately $321,000 from the sale of his San Bruno home.

Unfortunately, the Steels' offer in compromise was rejected by the IRS and on October 4, 1999, the Steels told Strebel that they could not sell him the Sonoma house because of the outstanding tax liens. Strebel placed the proceeds from the sale of the San Bruno house into a bank account bearing 4 percent interest and for over one year searched unsuccessfully for additional properties in Sonoma. By September 2001, he was still unable to find a suitable replacement property and began to conclude that he had been priced out of the Sonoma County real estate market.

On June 27, 2000, Strebel filed a complaint against Brenlar and Smith alleging unfair business practices, fraud, negligence, and breach of fiduciary duty. At the liability phase of the trial, which began in July 2003, the jury found that Smith and Brenlar had intentionally concealed material facts with the intent to defraud Strebel and on a separate verdict form that they were also liable for negligence.[1] Strebel was awarded $300,000 in economic damages on both claims. The negligence verdict form alone contained a space for noneconomic damages, which the jury found to be an additional $50,000. The jury found that Brenlar and Smith acted with oppression and fraud, but not malice.

After the jury returned its verdict on Friday, September 5, 2003, the court ordered the jury to return the following Monday to begin the punitive damages phase of the trial. At the same time, Strebel dismissed his punitive damages claim against Smith. On August 29, in anticipation of the punitive damages phase, Strebel had attempted to subpoena Brenlar's financial documents. At a hearing on the afternoon of September 5, Brenlar argued that the subpoenas had not been properly served and that an additional document request made only that afternoon was unreasonable. The court continued the hearing to Monday morning and ultimately determined that Strebel had not subpoenaed Brenlar's financial documents in a timely manner. Because Strebel was unable to present any evidence in support of his claim for punitive damages, the court excused the jury and entered judgment. Defendants filed a timely notice of appeal and Strebel filed a timely notice of cross-appeal.

## Discussion

### I. Defendants' Appeal Regarding Damages

Strebel's claimed economic damages consisted of several components: the lost appreciation of his San Bruno house between its sale in 1999 and trial in 2003, the lost use of the property during that period, and other components that are not disputed on appeal.[2] Strebel's expert witness John D'Andrea testified to Strebel's economic damages, including the value of the loss of

---

[1] The jury returned separate verdicts on three fraud theories: intentional and negligent misrepresentation and concealment. The jury found in favor of Smith and Brenlar on the claims for intentional and negligent misrepresentation. The jury also found in Strebel's favor on a breach of contract claim against the sellers of the Sonoma property. No appeal has been taken from the judgment entered on that claim.

[2] Strebel presented evidence of his closing costs on the sale of the San Bruno property plus interest to the time of trial ($38,985), interest on $10,000 lost during a period when the seller of the Sonoma property refused to return Strebel's deposit in that amount ($306), and an offset against his damages for the interest earned on the sale proceeds of the San Bruno home between the time of sale and trial ($41,490).

appreciation and use of the San Bruno property. D'Andrea calculated the gross lost appreciation by subtracting the 1999 sale price from his opinion of the then current fair market value of the house based on a study of comparable sales. This produced an increase in value of 46 percent, which he considered to be conservative when compared to a 62 percent rate of appreciation between 1999 and 2003 reflected in a general market indicator survey to which he referred. He then reduced the gross amount by the estimated closing costs on such a sale to reach net lost appreciation, which he calculated to be $183,427.

D'Andrea calculated Strebel's loss of use damages by subtracting the costs associated with living in his house, mortgage interest, taxes and insurance, from the cost of renting a similar house in San Bruno. This difference was $66,046. Adding this amount to $183,427 of lost appreciation and including the other undisputed damage elements produced a total of $247,273, which was D'Andrea's opinion of economic damages and the amount that Strebel's attorney asked the jury to award.

Strebel's noneconomic damages were based on claimed emotional distress arising from "him not having a house and running around looking for a place to live" and from "financial injury . . . includ[ing] the withholding of Mr. Strebel's ten thousand dollar security deposit at the exact time when he was looking for another house to buy and would have needed that to pay towards another purchase ·offer."

As indicated *ante*, the jury returned verdicts awarding Strebel $300,000 in economic damages on his concealment and negligence claims and an additional $50,000 in noneconomic damages on his negligence claim. Judgment was entered in his favor against Brenlar and Smith for $305,000. It appears that the court deducted from $350,000 5 percent comparative fault that the jury attributed to Strebel[3] and an additional amount received by Strebel in settlement of related claims against another party. Thereafter, the court denied motions for judgment notwithstanding the verdict and a new trial that were grounded primarily on the claimed excessiveness of the damages.

1. *Appreciation Damages*

By an in limine motion, defendants moved to exclude evidence of appreciation in the value of the San Bruno property. After extended argument and supplemental briefing, the court denied the motion, accepting Strebel's contention that lost appreciation is a proper element of recovery under Civil

---

[3] Strebel has not questioned the propriety of making the deduction against the damages awarded for the tort of intentional concealment and thus has waived any potential issue in that regard.

Code[4] section 3343, which defines the measure of damages generally for fraud in the purchase, sale or exchange of property.[5] On appeal, Strebel implicitly acknowledges the inapplicability of section 3343, and defends the admissibility of the appreciation evidence under the broader measure of damages for torts under sections 1709 and 3333.[6] Without objection, the court instructed the jury under all of these sections. Referring to the claim of constructive fraud by a fiduciary, the court drew from section 3333 and instructed that damages "must be in an amount that would compensate plaintiff for all harm or loss caused by [defendants'] wrongful conduct, whether the harm or loss caused by [defendants'] wrongful conduct could have been anticipated or not." Referring to the claim of fraudulent concealment, the court drew from section 3343 and BAJI No. 12.56 and instructed on the out-of-pocket measure of damages ("amount of the award should include, one, the difference, if any, between the actual value of that with which the plaintiff parted and the actual value of that which was received") and on the additional items of recovery authorized by section 3343, subdivision (a), paragraphs (1), (2) and (3) ("amounts actually and reasonably expended in reliance upon the fraud; . . . any amount which would compensate the plaintiff for loss of use and enjoyment of the property to the extent that any such loss was caused by the fraud; and . . . any amount which would compensate the plaintiff for any profits or other gains which might reasonably have been earned by use of the property had the plaintiff retained it.") The court used BAJI No. 3.76 to instruct on causation[7] and BAJI No. 14.68 to instruct on the duty to mitigate damages.[8]

---

[4] All statutory references are to the Civil Code unless otherwise indicated.

[5] Section 3343, subdivision (a) provides: "One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction, including the following: [¶] (1) Amounts actually and reasonably expended in reliance upon the fraud. [¶] (2) An amount which would compensate the defrauded party for loss of use and enjoyment of the property to the extent that any such loss was proximately caused by the fraud. [¶] (3) Where the defrauded party has been induced by reason of the fraud to sell or otherwise part with the property in question, an amount which will compensate him for profits or other gains which might reasonably have been earned by use of the property had he retained it. . . ."

[6] Section 1709 provides: "One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." Section 3333 provides: "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."

[7] The jury was instructed that "[t]he law defines cause in its own particular way. A cause of damage, loss or harm is something that is a substantial factor in bringing about any damage, loss or harm."

[8] The jury was instructed that "[a] person whose property has been damaged by the wrongful act of another is bound to exercise reasonable care and diligence to avoid loss and

■ Although of little consequence,[9] there are two reasons for which section 3343 does not apply in this case. For one, the fraud was perpetrated by a fiduciary. "California law is committed to the view that the fraudulent breach of fiduciary duty is a tort, and the faithless fiduciary is obligated to make good the full amount of the loss of which his breach of faith is a cause. [Citations.] In accordance with this general principle, the cases hold that while the fraudulent property transactions between a vendor and vendee are governed by the special 'out-of-pocket-loss' rule espoused in section 3343 [citations], where, as here, the defrauding party stands in a fiduciary relationship to the victim of fraud, the damages must be measured pursuant to the broad provisions of sections 3333 and 1709[,] regulating compensation for torts in general." (*Pepitone v. Russo* (1976) 64 Cal.App.3d 685, 688–689 [134 Cal.Rptr. 709], fn. & italics omitted.) More recently the California Supreme Court reiterated, " 'In California, a defrauded party is ordinarily limited to recovering his "out-of-pocket" loss . . . .' [Citation.] [¶] In fraud cases involving the 'purchase, sale or exchange of property,' the Legislature has expressly provided that the 'out-of-pocket' rather than the 'benefit-of-the-bargain' measure of damages should apply. (§ 3343, subds. (a), (b)(1).) This section does not apply, however, when a victim is defrauded by its fiduciaries. In this situation, the 'broader' measure of damages provided by sections 1709 and 3333 applies." (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1240–1241 [44 Cal.Rptr.2d 352, 900 P.2d 601], fns. omitted (*Alliance*).)

■ Secondly, in *Channell v. Anthony, supra,* 58 Cal.App.3d at page 315, the court held that the consequential damages provided under section 3343, subdivision (a)(2) and (3) are available only in conjunction with a claim for rescission. (*Channell v. Anthony, supra,* at p. 315 ["[b]y electing to drop their rescission cause of action respondents gave up any right to claim loss of profits, except as such right was created by the final agreement"]; see also Miller & Starr, Cal. Real Estate (3d ed. 2005) § 34:89 ["A seller who loses the use and enjoyment of the premises as a proximate result of the buyer's misrepresentations can recover the value of the loss-of-use of the premises by bringing an action for rescission, but the loss of use usually cannot be recovered when the seller affirms the contract and seeks the recovery of damages because the right of possession was transferred to the buyer when title was conveyed" (fns. omitted)].)

minimize damages, and may not recover for losses which could have been prevented by reasonable efforts or by expenditures that might reasonably have been made."

[9] See *Stout v. Turney* (1978) 22 Cal.3d 718, 726 [150 Cal.Rptr. 637, 586 P.2d 1228] (Legislature's purpose in amending section 3343 was to eliminate the logical inconsistency that existed between fraud cases involving property transactions, where lost profits had not been recoverable, and fraud cases not involving property transactions, where lost profits had always been recoverable under the broad tort measure of section 3333); *Channell v. Anthony* (1976) 58 Cal.App.3d 290, 315 [129 Cal.Rptr. 704].

While sections 1709 and 3333 thus provide the applicable statutory basis for the calculation of damages in this case, there is a split of authority regarding the proper measure of damages under section 3333 for a real estate broker's intentional fraud. (*Alliance, supra,* 10 Cal.4th at pp. 1249–1250.) In *Alliance,* the court explained, "We have previously held that a plaintiff is only entitled to its actual or 'out-of-pocket' losses suffered because of fiduciary's negligent misrepresentation under section 3333. [Citations.] While the measure of damages under section 3333 might be greater for a fiduciary's *intentional* misrepresentation, we need not address that issue here." (*Alliance, supra,* at pp. 1249–1250.) Some appellate courts have held that "the measure of damages provided by [sections 1709 and 3333] is substantially the same as that for breach of contract prescribed by section 3300; i.e., it tends to give the injured party the benefit of his bargain and insofar as possible to place him in the same position he would have been [in] had the promisor performed the contract." (*Pepitone v. Russo, supra,* 64 Cal.App.3d at p. 689, italics omitted; see *Fragale v. Faulkner* (2003) 110 Cal.App.4th 229, 232 [1 Cal.Rptr.3d 616].) Others, however, have concluded that the out-of-pocket rule should apply. (*Overgaard v. Johnson* (1977) 68 Cal.App.3d 821, 823–824 [137 Cal.Rptr. 412] (*Overgaard*); see *Hensley v. McSweeney* (2001) 90 Cal.App.4th 1081, 1085–1086 [109 Cal.Rptr.2d 489].) In these cases, the courts have observed that section 3333 "does *not* set forth any benefit of the bargain rule. That section simply sets out the measure of damages long recognized in torts, namely, to compensate a plaintiff for a loss sustained rather than give him the benefit of any contract bargain." (*Overgaard, supra,* at pp. 823–824; see *Hensley v. McSweeney, supra,* at pp. 1085–1086.)

Sometimes, however, neither the out-of-pocket nor benefit-of-the-bargain measure is particularly helpful or appropriate. "We often look upon the out of pocket rule and the benefit of the bargain rule as being the sole antagonists on the battlefield of damages when at times neither is truly applicable." (*Overgaard, supra,* 68 Cal.App.3d at p. 823.) Such is the case here. Strebel's damages cannot be measured in terms of out-of-pocket loss or contractual benefits and expectations. Unlike the more common situation in which the actionable fraud relates to the value of the property being sold or exchanged (e.g., *Salahutdin v. Valley of California, Inc.* (1994) 24 Cal.App.4th 555, 561, 568 [29 Cal.Rptr.2d 463] [broker's misrepresentation as to size of property and ability to subdivide caused purchasers to pay more for property than it was worth]; *Housley v. City of Poway* (1993) 20 Cal.App.4th 801, 812–813 [24 Cal.Rptr.2d 554] [developer's misrepresentation regarding easement caused owner to sell property for less than it was worth]), the facts that were fraudulently concealed here had nothing to do with the value of the Sonoma or

San Bruno properties. Strebel's damages arose neither because the value of either property was more or less than the agreed price nor because the value of either was other than as promised.[10] The question is not whether Strebel is entitled to his out-of-pocket losses or to the benefit of his bargain, but whether the amount by which the value of his San Bruno home appreciated after he sold it is a reasonable measure of the harm he suffered as the consequence of defendant's fraud.

"Tort damages are awarded to fully compensate the victim for all the injury suffered. [Citation.] There is no fixed rule for the measure of tort damages under Civil Code section 3333. The measure that most appropriately compensates the injured party for the loss sustained should be adopted." (*Santa Barbara Pistachio Ranch v. Chowchilla Water Dist.* (2001) 88 Cal.App.4th 439, 446–447 [105 Cal.Rptr.2d 856].) The jury here was correctly advised that "the damages awarded must be in an amount that would compensate plaintiff for all harm or loss caused by [defendants'] wrongful conduct" and that defendants' fraud must be a substantial factor in causing Strebel's loss.

Strebel asserted that he was injured because defendants' fraud caused him to sell his San Bruno house sooner than he would otherwise have done, rendering him unable to purchase a replacement home before housing values substantially increased. Strebel testified that he intended to sell his home and purchase the new house in Sonoma at the same time, thereby limiting the impact of market fluctuations on the exchange. However, because of defendants' fraud, Strebel was unable to make the second transaction before market values rose. The resultant harm was a decrease in the buying power of the proceeds of his San Bruno house in a rapidly appreciating housing market. In the words of Strebel's attorney in closing argument, "All we're asking for here is for him in effect to get enough money to now buy something comparable to the [Sonoma] property in today's market. That would be the net effect of what we're asking for, which would in a sense put him back to where he was back in 1999." In permitting the jury to consider lost appreciation, the trial court properly determined that the jury could reasonably find this element necessary to compensate Strebel for the injury caused

---

[10] Defendants acknowledge that benefit-of-the-bargain damages make no sense in this case, albeit for a different reason. They suggest that "Brenlar's fraud convinced Strebel that he could buy the Sonoma house. If that 'had been true,' then Strebel would own the Sonoma house, and thus his benefit-of-the-bargain damages would be to place him in the Sonoma house." This analysis is flawed, however, because the jury found that defendants concealed information that would have led Strebel to delay the sale of his San Bruno home, not that would have led him to believe the sale of the Sonoma County house would close.

by defendants' concealment. Under the circumstances shown by the evidence, the jury was entitled to find that recovery of the lost appreciation was reasonable compensation for Strebel's inability to purchase an acceptable home in Sonoma concurrently with the sale of his San Bruno house.[11]

■ Defendants contend that "sections 1709 and 3333 do not authorize Strebel's appreciation damages because damages proximately caused by fraud are determined as of the date when the fraud took effect—not by a later increase or decline in value." In *Estate of Anderson* (1983) 149 Cal.App.3d 336, 354 [196 Cal.Rptr. 782], the court rejected the argument that "there is no basis in California law for an award of so-called 'appreciation damages.'" The court upheld an award of damages based on the value at the time of trial rather than the time of the sale of property which the seller had been fraudulently induced to sell. The court concluded that "California law is not as restrictive as the bank urges, and [found] that the award in this case does not offend against reasonableness or any other policy of recovery." (*Ibid.*) The court relied in part on *Estate of Talbot* (1956) 141 Cal.App.2d 309, 323 [296 P.2d 848], in which another court recognized that in cases involving a breach of loyalty, "'the trier of the fact should have some discretion to fix the damages in accordance with the nature and degree of the breach . . . . Thus, what constitutes making "good" the loss may vary according to the circumstances.'" (*Estate of Anderson, supra,* at p. 355.) Likewise, in *Garrett v. Perry* (1959) 53 Cal.2d 178 [346 P.2d 758], the court held that "[t]he statement . . . that damages are to be assessed as of the date of the fraudulent transaction is too broad insofar as it means that the court can not consider subsequent factors which affect the amount of the actual loss." (*Id.* at p. 185.) ■ "The fact that values must ordinarily be considered as of the time of the fraudulent transaction does not mean that the court cannot consider circumstances other than value which operate to increase or reduce the injury." (*Id.* at p. 186.) Here, measuring Strebel's damages at the time of the sale would provide no compensation for the most significant portion of the loss he suffered as a result of defendants' fraud.

---

[11] This approach is analogous to the manner in which damages are calculated when a third party fraudulently induces the sale of securities. In *Mitchell v. Texas Gulf Sulphur Company* (1971) 446 F.2d 90, 104, the court stated that proper calculation of damages starts with the "proposition that the aim of courts in this situation is to restore claiming parties to the positions they would have enjoyed had they not been fraudulently induced to sell their stock." In that case, the court upheld an award of damages measured by the difference between the defrauded seller's sale price and the highest daily price of the stock within a reasonable time after discovery of the fraud. (*Id.* at p. 105.) The court held that the defrauded seller should be allowed a reasonable time after learning of the fraud to decide whether or not he would reinvest but thereafter must suffer the consequences of a decision not to reinvest. (*Ibid.*) Here, as discussed below, the jury was instructed on Strebel's duty to mitigate and apparently concluded that he did make reasonable efforts to do so.

(*Salahutdin v. Valley of California, Inc., supra,* 24 Cal.App.4th at p. 568 [measuring benefit of the bargain damages "as of the date of the transaction would defeat the goal of compensation for the entire loss where, as here, discovery of the fiduciary's constructive fraud did not occur until years after purchase of the property"].)

Defendants' reliance on *Safeco Ins. Co. v. J & D Painting* (1993) 17 Cal.App.4th 1199, 1204 [21 Cal.Rptr.2d 903] (*Safeco*), is misplaced. In *Safeco,* the defendant's negligence caused significant fire damage to the plaintiff's house. During the five months that it took to repair the damage, the real estate market declined significantly, reducing the value of the plaintiff's house by $300,000. The court rejected the plaintiff's claim for depreciation damages based on his lost opportunity to sell the property before the market declined, holding that the recovery of such damages would be inconsistent with the general rule that in a suit for negligent damage to real property the plaintiff may recover the lesser of the cost of repair or the diminution in value, but not both. The court reasoned, "it is conceded appellant might be able to show that, but for respondent's negligence, he would have been able to sell his house earlier for more than he can now obtain. The rule for recovery in tort has never rested solely on 'but for' causation (cause in fact), but has also been based on proximate cause. Thus, Civil Code section 3333 mandates recovery not simply for all detriment caused by defendant's negligence, but for all detriment *proximately caused* thereby. . . . [¶] A superseding cause utterly unrelated to the defendant's negligence breaks the chain of proximate causation and is a bar to recovery. ' "Liability cannot be predicated on a prior and remote cause which merely furnishes the condition or occasion for an injury resulting from an intervening unrelated and efficient cause, even though the injury would not have resulted but for such condition or occasion . . . ." ' [Citations.] Although appellant might have sold his house at a high price but for respondent's negligence, the decline in the market bore no relation whatsoever to the acts of respondent. Respondent's negligence, if such there was, was merely the condition or occasion for the market decline to affect appellant's house. [¶] In assessing proximate cause, courts also look to the foreseeability of the superseding cause of injury. [Citation.] It can hardly be said that respondent should have foreseen the steep decline that has occurred in California real estate values. If history had been any guide, a delay in sale of property in California would more likely increase the return of the owner." (*Id.* at pp. 1204–1205.)

*Safeco* is distinguishable for many reasons. First, the damage in *Safeco* was caused by defendant's negligence, not intentional fraud by a fiduciary as in this case. As noted *ante,* "the faithless fiduciary is obligated to make good the full amount of the loss of which his breach of faith is a cause." (*Pepitone v.*

*Russo, supra,* 64 Cal.App.3d at p. 688; *Prince v. Harting* (1960) 177 Cal.App.2d 720, 731 [2 Cal.Rptr. 545] ["It has long been the law in this state that a faithless fiduciary must repay to the beneficiary of his fiduciary duties the entire profit that he caused the beneficiary to lose"].) More importantly, Strebel's diminished buying power in the rising real estate market was substantially related to defendants' fraud. The jury was instructed on the proper standard of causation ("substantial factor") and the record supports its finding that defendants' fraud was a substantial factor in bringing about Strebel's damages.[12] The rising value of the property he intended to purchase with the proceeds from the San Bruno home was not unforeseeable and, indeed, was the very reason Strebel testified he told defendants he wanted to be sure the Sonoma purchase would close before he sold the San Bruno property. Finally, in *Safeco,* the court concluded that "there is no compelling public policy reason to allow plaintiff[ ] to recover when the time needed to repair . . . coincides with a general decline in the market for such properties. Such a recovery would surely not deter negligence in any meaningful way." (*Safeco, supra,* 17 Cal.App.4th at pp. 1205–1206.) Allowing recovery for lost appreciation under the facts of this case, however, will provide a significant deterrent to a real estate agent fraudulently misleading prospective buyers under similar circumstances in the future.[13]

■ Defendants' next argument, that "Strebel's appreciation damages are barred by the doctrine of 'avoidable consequences' " is no more persuasive. Defendants contend that "uncontradicted evidence shows that Strebel had the financial ability to buy another San Bruno area house. This simple action would have avoided his claimed damages for lost appreciation. [¶] Under the doctrine of avoidable consequences, Strebel's failure to take reasonable steps

---

[12] Defendants requested and the jury was instructed on the concept of an unforeseeable superseding cause with respect to whether the acts of Strebel's agent for the sale of the San Bruno house extinguished defendants' liability for Strebel's loss. No such instruction was requested or given with respect to whether appreciation in the housing market was an unforeseeable superseding cause.

[13] Defendants' reliance on *Graf v. Sumpter* (1962) 207 Cal.App.2d 391 [24 Cal.Rptr. 590] and *McCue v. Bruce Enterprises, Inc.* (1964) 228 Cal.App.2d 21 [39 Cal.Rptr. 125] is also misplaced. In *Graf,* the court held that a defrauded purchaser still in possession of the property was entitled to out-of-pocket damages measured at the time the purchase contract was entered without an offset for appreciation between that date and the close of escrow. (*Graf v. Sumpter, supra,* at p. 393 ["Subsequent appreciation of value due to increase in market prices in the area generally should not be charged to [reduce] plaintiffs[' damages]" because "they are entitled to the benefit of any increase in the value of the land after they became its equitable owners"]; see also *McCue v. Bruce Enterprises, Inc., supra,* at pp. 31–32 [same].) In contrast, Strebel was denied the benefit of the increased value of his property to which he would have been entitled had defendants' fraud not caused him to sell.

to avoid lost appreciation conclusively bars his recovery for lost appreciation." In *State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1043–1044 [6 Cal.Rptr.3d 441, 79 P.3d 556], the court explained, "Although courts explaining the avoidable consequences doctrine have sometimes written that a party has a 'duty' to mitigate damages, commentators have criticized the use of the term 'duty' in this context, arguing that it is more accurate to state simply that a plaintiff may not recover damages that the plaintiff could easily have avoided. [Citations.] A federal appellate court explained the guiding principle this way: '[T]he community's notions of fair compensation to an injured plaintiff do not include wounds which in a practical sense are self-inflicted.' [Citations.] [¶] Under the avoidable consequences doctrine as recognized in California, a person injured by another's wrongful conduct will not be compensated for damages that the injured person could have avoided by *reasonable* effort or expenditure. [Citations.] The reasonableness of the injured party's efforts must be judged in light of the situation existing at the time and not with the benefit of hindsight." (Italics added.) Strebel does not dispute that "recovery will not be allowed for damages that a party should have foreseen and could have avoided by reasonable effort without undue risks, expense, or humiliation." As indicated *ante*, the jury was instructed that Strebel "may not recover for losses which could have been prevented by reasonable efforts or by expenditures that might reasonably have been made." Despite defendants' argument to the contrary, the jury apparently concluded that Strebel did not act unreasonably by investing the proceeds from the sale of the San Bruno property in an interest-bearing money market account, the interest from which was deducted from the calculation of damages. The jury was entitled to reject defendants' contention that it was unreasonable for Strebel not to purchase a replacement house in a city in which he no longer wished to live.

Contrary to defendants' assertion, there is nothing inequitable about the recovery of appreciation damages in this case. The fact that Strebel received what was the fair market value for his house at the time he sold it did not eliminate financial loss from the premature sale of the property. Nor did Strebel attempt to profit from an unreasonable delay in filing suit. Upholding the jury's verdict in this case does not imply that a defrauded plaintiff may recover appreciation damages over an unlimited period of time.[14] Strebel

---

[14] At oral argument, defendants' counsel asserted that permitting recovery of lost appreciation in this case would imply that a plaintiff might recover unlimited damages by delaying prosecution of the action for many years. We disagree. The statute of limitations aside, at some point the failure to reinvest may well become unreasonable. At that point the chain of causation would be broken and the loss of additional appreciation would be attributable to the plaintiff's decision not to reinvest. The jury reasonbly concluded that this point was not reached in this case.

filed his complaint within a year of the fraud and for over a year after the complaint was filed continued to look for a suitable replacement property. The jury was entitled to conclude that Strebel made reasonable efforts to avoid the adverse consequences of having sold his former home without being able to purchase a new one as the defendants had led him to believe he could. The amount by which the value of Strebel's former home appreciated after the fraudulently induced sale was a reasonable measure of his damage in this case.

### 2. *Lost use damages*

D'Andrea calculated Strebel's damage for the loss of the use of his San Bruno home between the sale and the time of trial by subtracting Strebel's costs of living in the house (interest on mortgage, taxes and insurance) from the market rent for a similar home. Defendants argue that "[f]or the same reasons that appreciation damages should not be allowed, this Court should also strike from the judgment the $66,046 in lost 'use' damages." However, as with the loss of appreciation, the jury was entitled to find that Strebel suffered this loss when he sold his house in reliance on defendants' fraud. He is equally entitled under section 3333 to recover for his loss of use of the San Bruno home.

### 3. *The economic damages must be reduced by $52,727*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### 4. *Emotional distress damages*[†]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### II. *Strebel's Cross-appeal Regarding Punitive Damages*[‡]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[*]Part I.3. is not certified for publication. (See fn., *ante*, p. 740.)
[†]Part I.4. is not certified for publication. (See fn., *ante*, p. 740.)
[‡]Part II. is not certified for publication. (See fn., *ante*, page 740.)

## Disposition

The judgment shall be reduced by $102,727 to $202,273 and, as so modified, is affirmed in all other respects. The parties shall bear their own costs on appeal.

McGuiness, P. J., and Parrilli, J., concurred.

A petition for a rehearing was denied January 31, 2006, and the petition of defendants and appellants for review by the Supreme Court was denied May 10, 2006, S141288. George, C. J., did not participate therein.