CHERYL DAVIS, AN INDIVIDUAL; AND TRIPLE WIN, LLC, DBA PLATINUM PROPERTIES GMAC REAL ESTATE, A NEVADA LIMITED LIABILITY COMPANY, APPELLANTS/CROSS-RESPONDENTS, v. KRISTEN L. BELING, AN INDIVIDUAL; AND WILLIAM DOUGHERTY, JR., AN INDIVIDUAL AND AS TRUSTEE OF THE DOUGHERTY-BELING FAMILY TRUST, RESPONDENTS/CROSS-APPELLANTS.

No. 53182

June 14, 2012                                   278 P.3d 501

*David J. Winterton & Associates, Ltd.*, and *David J. Winterton* and *David E. Doxey*, Las Vegas, for Appellants/Cross-Respondents.

*Dziminski & Associates* and *Brian R. Dziminski*, Las Vegas, for Respondents/Cross-Appellants.

Before SAITTA, HARDESTY and PARRAGUIRRE, JJ.

## OPINION

By the Court, SAITTA, J.:

In this appeal and cross-appeal, we address several issues arising from a dispute over a series of property transactions. First, we are asked to construe NRS 48.105, which provides that evidence of offers of compromise must be excluded when introduced "to prove liability for or invalidity of the claim or its amount," but also states that exclusion is not required "when the evidence is offered for another purpose." In particular, we consider whether evidence of compromise offers is admissible for the purpose of demonstrating a failure to mitigate damages. Applying the plain language of NRS 48.105, we conclude that compromise offers are not admissible for this purpose because evidence demonstrating a failure to mitigate damages necessarily goes to the "amount" of a claim. Accordingly, the district court did not err in excluding such evidence.

Next, we interpret NRS 645.251, which provides, in pertinent part, that real estate licensees are "not required to comply with any principles of common law that may otherwise apply to any of the duties of the licensee as set forth in NRS 645.252, 645.253 and 645.254." Specifically, we address whether NRS 645.251 shields real estate licensees from common law forms of liability. We conclude that although the statute does not, in all instances, shield real estate licensees from common law forms of liability, it precludes such liability when the type of conduct complained of is covered by NRS 645.252, 645.253, or 645.254. Here, because the fraud-by-concealment claim brought against appellant/cross-respondent Cheryl Davis by respondents/cross-appellants Kristen Beling and William Dougherty, Jr. (the Doughertys) is premised on the type of conduct covered in NRS 645.252-645.254, the district court erred in entering judgment on this claim. The court did not err, however, in entering judgment, as to liability, on the Doughertys' NRS 645.257 claim that Davis breached the duties imposed by NRS 645.252-645.254. Nor did the district court err in entering judgment, as to liability, on the Doughertys' NRS 645.257 claim against appellant/cross-respondent Triple Win, LLC, d.b.a. Platinum Properties GMAC Real Estate (Platinum) because that claim is predicated on a theory of liability not covered in NRS 645.252-645.254.

We next address the damages that are recoverable for a real estate licensee's breach of the duties set forth in NRS 645.252-645.254, in light of NRS 645.257's declaration that "actual damages" may be recovered for such violations. We conclude that the term "actual damages" is synonymous with the term "compensatory damages." Thus, although punitive damages may not be recovered under NRS 645.257, we conclude that compensatory damages are recoverable under the statute in accordance with the measure of damages that appropriately compensates the injured party for the losses sustained as a result of the real estate licensee's violations. In the instant case, the district court did not err in determining that diminution damages were an appropriate measure of the Doughertys' compensatory damages, but it erred in precluding their recovery of the consequential damages necessary to fully compensate them for their losses.

Finally, we address whether the Doughertys are entitled to an award of attorney fees pursuant to the listing and purchase agreements for the properties at issue. We conclude that because the Doughertys successfully defended against the breach of contract claims brought against them under these agreements, they are entitled to an award of attorney fees under the terms of these agreements. Consequently, the district court erred in denying the Doughertys' request for these fees.

## FACTS AND PROCEDURAL HISTORY

*Background*

In 2005, the Doughertys decided to sell their home located on Augusta Drive in Henderson (the Augusta Property) and build a custom home in the MacDonald Highlands development in Henderson. The Doughertys entered into a listing agreement with Davis and Platinum, whereby Davis would serve as the agent for the listing and sale of the Augusta Property and Platinum would act as the broker. The Doughertys explained to Davis that they wished to use the proceeds from the sale of the Augusta Property in order to finance the acquisition of the lot for their custom-built home.

Thereafter, the Doughertys agreed to sell the Augusta Property to Chris and Tracy Byrd. The Byrds provided the Doughertys with an earnest money deposit, and escrow was set to close in a few months. The Doughertys then located a lot in the MacDonald Highlands development on which they wished to build their custom home (the MacDonald Highlands Property). Davis assured the Doughertys that the Byrds would go through with the purchase of the Augusta Property and, relying on these assurances, the Doughertys closed on the MacDonald Highlands Property, despite the fact that the Byrds had not yet closed on the Augusta Property.

The Doughertys needed a place to live during the interim period between the anticipated sale of the Augusta Property and the estimated two-year construction of the MacDonald Highlands Property. Davis convinced the Doughertys that purchasing a property and then selling it at a profit after they moved into the MacDonald Highlands Property would be preferable to renting a residence. Thus, Davis showed the Doughertys a few properties located in Henderson, including a residence located on Ping Drive (the Ping Property). The Doughertys thereafter entered into an agreement to purchase the Ping Property for $825,000. The Doughertys explained to Davis, however, that it was imperative that the closing of the Ping Property be contingent on the closing of the Augusta Property because they needed to use the funds from the sale of the Augusta Property in order to close on the Ping Property. Contrary to these instructions, Davis did not make the Doughertys' offer on the Ping Property contingent.

The planned series of transactions started to unravel when problems began to threaten the closing of the Augusta Property due to the Byrds' difficulty in selling their home. Davis, however, repeatedly represented to the Doughertys that the sale of the Augusta Property had successfully closed. In fact, the sale had not closed, and Davis thereafter called the Doughertys and conceded that the Augusta Property was not closing. Davis explained to the Doughertys that the Byrds were unable to sell their home, and, as a result, they could not purchase the Augusta Property.

The following day, the Doughertys spoke with the Byrds' lender, who informed the Doughertys that the Byrds still wished to purchase the Augusta Property, but that they needed three days to obtain the necessary funds to do so. Immediately thereafter, Davis called the Doughertys and told them that they needed to close escrow on the Ping Property or they would lose their earnest money deposit. By this time, the Doughertys no longer trusted Davis, and they told her that they did not wish to close on the Ping Property because the Augusta Property had not closed. Then, purporting to be acting on behalf of the Byrds, Davis offered to advance the Doughertys the $150,000 needed to close on the Ping Property. Davis told the Doughertys that the Byrds would close on the Augusta Property in a few more days. She then represented that she was placing the money into escrow on behalf of the Byrds for the Augusta Property. Relying on Davis's assurances that she had worked out an arrangement for the Byrds to close on the Augusta Property, the Doughertys accepted the $150,000 advance and closed on the Ping Property. Ultimately, the Byrds were unable to successfully close on the Augusta Property. Afterward, Davis verbally offered to purchase the Ping Property from the Doughertys, but the Doughertys refused.

*Proceedings below*

Davis sued the Doughertys under various theories of liability, including breach of contract, unjust enrichment, and fraud, seeking to recover the $150,000 that she had advanced to the Doughertys. The Doughertys countersued Davis for, among other things, negligent misrepresentation, fraud by misrepresentation and concealment, breach of fiduciary duty, slander of title, and abuse of process. In addition, the Doughertys brought a claim against Davis under NRS 645.257, which provides a statutory cause of action for the victim of a real estate licensee's breach of the various duties imposed by NRS 645.252-645.254. The Doughertys also sued Platinum under NRS 645.257, based on a respondeat superior theory. Platinum filed a third-party complaint against the Doughertys for breach of the listing and purchase agreements for the Augusta Property and the purchase agreement for the Ping Property.

The Doughertys later rejected an offer of judgment made by Davis. Davis similarly rejected an offer of judgment made by the Doughertys, and the dispute was scheduled for a jury trial. Around this time, the Doughertys filed a motion in limine to exclude evidence of Davis's oral offer to buy the Ping Property, asserting that NRS 48.105(1) requires the exclusion of this evidence. The district court granted the Doughertys' motion. Davis, in turn, filed a motion in limine seeking to prevent the Doughertys from recovering

or presenting evidence relating to their mortgage payments, taxes, insurance, maintenance expenses, and other carrying costs for the Ping Property, offset by their mitigation of those damages by renting the property. Davis asserted that the Doughertys may only recover their out-of-pocket damages, and that the carrying costs for the Ping Property do not fall within this category. Davis also asserted that the economic loss doctrine bars the recovery of such damages. The district court agreed, thereby precluding the Doughertys from recovering their carrying costs. Before the commencement of trial, Davis requested that the district court dismiss the Doughertys' causes of action for fraud and their other common law claims, asserting that such claims are precluded by NRS 645.251. The district court declined to do so.

Following the parties' presentation of their respective cases, the district court dismissed several claims and submitted the remaining claims to the jury by way of special verdict forms. Specifically, the district court submitted Davis's claims against the Doughertys for breach of contract, unjust enrichment, and fraud, along with Platinum's claim against the Doughertys for breach of contract. The district court also submitted the Doughertys' fraud-by-misrepresentation, fraud-by-concealment, abuse of process, slander of title, and NRS 645.257 claims against Davis, as well as the Doughertys' NRS 645.257 claim against Platinum.

Before sending the jury to deliberate, the district court provided it with various instructions, including an instruction regarding the out-of-pocket rule—that is, that the Doughertys' damages should be limited to the difference between the value of what they received and the amount of money that they gave for it. But the special verdict forms that the district court provided to the jury also suggested to the jury that it could award diminution damages to the Doughertys on their fraud and NRS 645.257 claims.

The jury returned a verdict awarding Davis $115,455 on her unjust enrichment claim. It also awarded the Doughertys $199,558.66 on their fraud-by-concealment claim against Davis.[2] In addition, the jury awarded the Doughertys $100,000 in punitive damages on this claim. The jury also awarded the Doughertys $199,558.66 on their NRS 645.257 claim against Davis, but the district court remitted this award, reasoning that it was duplicative of the award on the Doughertys' fraud-by-concealment claim. Finally, the jury awarded the Doughertys $15,273.13 on their NRS 645.257 claim against Platinum, representing the amount of commission

---

[2]This figure represents the Doughertys' moving expenses ($9,558.66) plus the diminution in value of the Ping Property—that is, the difference between the price the Doughertys paid for the Ping Property in 2005 ($825,000) and the appraised value of the property at the time of trial in 2008 ($635,000).

Platinum received from the Ping Property transaction, along with $22,500 in punitive damages.[3] The jury rejected all other claims, and the district court entered judgment on the jury's verdict.

The Doughertys filed a post-judgment motion for attorney fees, asserting that such an award was authorized by the offer of judgment rule, as well as the listing and purchase agreements for the Augusta Property and the purchase agreement for the Ping Property. The district court awarded attorney fees to the Doughertys under the offer of judgment rule, but it denied their request for fees under the listing and purchase agreements. Davis and Platinum now appeal, challenging various aspects of the district court's judgment. The Doughertys cross-appeal, contending that the district court erred in limiting the amount of their recoverable damages and their attorney fees award.

## DISCUSSION

As noted, Davis and Platinum raise several contentions on appeal. Davis first argues that the district court erred in excluding, under NRS 48.105(1), evidence of her offer to purchase the Ping Property from the Doughertys. Next, Davis contends that the district court erred in entering judgment on the Doughertys' fraud-by-concealment claim because NRS 645.251 shields her from all liability for common law causes of action. Platinum similarly contends that the district court erred in entering judgment on the Doughertys' NRS 645.257 claim against it because that claim was predicated on a respondeat superior theory of liability, which it asserts is precluded by NRS 645.251. Finally, Davis asserts that the district court erred in permitting the jury to award the Doughertys diminution damages.[4]

On cross-appeal, the Doughertys argue that the district court erred in precluding their recovery of the carrying costs for the Ping Property. They also assert that the court erred in determining that they are not entitled to attorney fees pursuant to the listing and purchase agreements for the Augusta Property and the purchase agreement for the Ping Property. We address Davis's contentions first.

### Davis's offer of compromise

Davis asserts that the district court erred in excluding evidence of her offer to buy the Ping Property, under NRS 48.105, because

---

[3]The jury also awarded the Doughertys damages on their abuse of process claim, but the district court remitted this award after the Doughertys waived their right to these damages.

[4]We have considered each of Davis's and Platinum's remaining contentions and conclude that they are without merit.

she introduced this evidence for the purpose of showing that the Doughertys failed to mitigate their damages. According to Davis, NRS 48.105 does not mandate exclusion in such a circumstance.

Although the district court's determination of the admissibility and relevance of evidence is generally reviewed for an abuse of discretion, *Thomas v. Hardwick*, 126 Nev. 142, 151, 231 P.3d 1111, 1117 (2010), "to the extent the evidentiary ruling rests on a legal interpretation of the evidence code, de novo review obtains." *Stephans v. State*, 127 Nev. 712, 716, 262 P.3d 727, 730 (2011). When construing a statute, we first examine its plain meaning. *Arguello v. Sunset Station, Inc.*, 127 Nev. 365, 370, 252 P.3d 206, 209 (2011). In examining the plain meaning of a statute, we read its provisions as a whole, and give effect to each of its words and phrases. *Id.* "When a statute is clear and unambiguous, we give effect to the plain and ordinary meaning of the words and do not resort to the rules of construction." *Cromer v. Wilson*, 126 Nev. 106, 109, 225 P.3d 788, 790 (2010).

An offer of compromise is an offer by one party to settle a claim "where an actual dispute or a difference of opinion exists" at the time the offer is made. *Affiliated Mfrs., Inc. v. Aluminum Co. of America*, 56 F.3d 521, 527 (3d Cir. 1995). At the time that Davis offered to buy the Ping Property from the Doughertys, a dispute between the parties had arisen, and Davis cannot seriously contend otherwise. When Davis made her offer, the parties had obtained representation, and as Davis later testified, "everyone was screaming litigation." As such, Davis's offer was clearly an offer of compromise.

Concerning offers of compromise, NRS 48.105 provides:

> 1. Evidence of:
> (a) Furnishing or offering or promising to furnish; or
> (b) Accepting or offering or promising to accept,
> a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim *or its amount.* Evidence of conduct or statements made in compromise negotiations is likewise not admissible.
>
> 2. This section does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

(Emphasis added.)

Thus, NRS 48.105(1) requires the exclusion of evidence of offers of compromise when such evidence is introduced to prove liability or the amount of a claim. But NRS 48.105(2) qualifies the reach of NRS 48.105(1) by providing that the introduction of this evidence is not prohibited if offered for "another purpose." We have not previously addressed whether evidence of an offer of compromise may be introduced for the purpose of demonstrating a failure to mitigate damages.

We conclude that compromise offers are not admissible for this purpose because when evidence of an offer of compromise is used to show a failure to mitigate damages, such evidence inescapably goes to the "amount" of the claim. This type of evidence thus falls within the precise proscription set forth by NRS 48.105(1)(b). Therefore, pursuant to the plain language of the statute, offers of compromise are not admissible to prove a failure to mitigate damages.

Our interpretation of NRS 48.105 finds ample support. When faced with this issue, federal circuit courts have concluded, after carefully construing Federal Rule of Evidence 408, the federal counterpart of NRS 48.105, that offers of compromise are not admissible on the issue of mitigation. For instance, in *Stockman v. Oakcrest Dental Center, P.C.*, the United States Court of Appeals for the Sixth Circuit reasoned that "mitigation necessarily goes to the amount of a claim," and therefore, admitting offers of compromise on the issue would "violate[ ] Rule 408 on its face." 480 F.3d 791, 798 (6th Cir. 2007). Similarly, in *Pierce v. F.R. Tripler & Co.*, the United States Court of Appeals for the Second Circuit concluded that "[e]vidence that demonstrates a failure to mitigate damages goes to the 'amount' of the claim and thus, if the offer was made in the course of compromise negotiations, it is barred under the plain language of Rule 408." 955 F.2d 820, 826-27 (2d Cir. 1992).[5]

---

[5]Davis asks that we follow a contrary set of federal decisions and secondary authorities that have suggested that evidence of offers of compromise is admissible on the issue of mitigation. Davis principally relies upon *Bhandari v. First National Bank of Commerce*, 808 F.2d 1082 (5th Cir. 1987), and *Urico v. Parnell Oil Co.*, 708 F.2d 852 (1st Cir. 1983). We find the *Bhandari* decision unpersuasive because it contains virtually no analysis and implies, incorrectly, that Rule 408 merely "excludes evidence of settlement negotiations if offered to prove or disprove liability." 808 F.2d at 1103. The *Urico* case is likewise unconvincing in that it does not address the actual language of FRE 408 to reach the conclusion that the rule provides for "flexibility" in the admissibility of compromise offers. 708 F.2d at 854. In short, we are not persuaded to follow these decisions. Instead, we apply NRS 48.105 according to its plain language, as the better-reasoned federal decisions hold, and as our well-established rules of statutory interpretation mandate. *See Arguello*, 127 Nev. at 370, 252 P.3d at 209; *Cromer*, 126 Nev. at 109, 225 P.3d at 790.

Moreover, the admission of evidence of compromise offers would not only violate the plain language of NRS 48.105(1)(b), it would undermine one of the statute's undisputed purposes, specifically, to prevent evidence of settlement efforts from " 'haunt[ing] a future legal proceeding.' " *Morrison v. Beach City LLC*, 116 Nev. 34, 39, 991 P.2d 982, 985 (2000) (quoting *Han v. Yang*, 931 P.2d 604, 613 (Haw. Ct. App. 1997)). Because the issue of mitigation centers on whether the injured party exercised reasonable care to avoid unnecessary damages, *see Automatic Merchandisers, Inc. v. Ward*, 98 Nev. 282, 284, 646 P.2d 553, 554 (1982), if evidence of compromise offers were admitted to show a failure of mitigation, then predictably, a substantial dispute would arise over whether the offer was reasonably refused.

The facts of this case dramatically illustrate this concern. There is absolutely no indication that Davis was in a position to produce, on a moment's notice, the $825,000 necessary to purchase the Ping Property. And, in view of Davis's dishonesty in the parties' previous dealings, it can hardly be said that it was unreasonable for the Doughertys to refuse to enter into yet another transaction involving her. Thus, if evidence of Davis's offer of compromise were admitted, the Doughertys would have every reason to show just how tenuous the offer was, and a lengthy dispute over the issue could ensue, which is an outcome that NRS 48.105 was specifically intended to prevent. *See Morrison*, 116 Nev. at 39, 991 P.2d at 985.

We also share the Second Circuit's concern in *Pierce* that the admission of such evidence would inhibit the efficient administration of justice by spurring a "rash of motions for disqualification of a party's chosen counsel who would likely become a witness at trial." 955 F.2d at 828. As the court explained, because it is commonplace for attorneys to be closely involved in the parties' settlement efforts before trial, "many attorneys would be forced to testify as to the nature of the discussions and thus be disqualified as trial counsel." *Id.*

We therefore conclude that under NRS 48.105, evidence of offers of compromise is not admissible to demonstrate a failure to mitigate damages. Accordingly, the district court did not err in excluding evidence of Davis's offer to purchase the Ping Property from the Doughertys.

### The Doughertys' fraud-by-concealment and NRS 645.257 claims

Davis asserts that the district court erred in entering judgment on the Doughertys' fraud-by-concealment claim because, as she interprets it, NRS 645.251 shields real estate licensees from any and all common law forms of liability. Similarly, Platinum asserts that NRS 645.251 precludes all common law forms of liability, and that the district court thus erred in entering judgment against it on the

Doughertys' NRS 645.257 claim, as this claim is premised on respondeat superior—a common law theory of liability.

"[Q]uestions of statutory construction, including the meaning and scope of a statute, are questions of law, which this court reviews de novo." *City of Reno v. Reno Gazette-Journal*, 119 Nev. 55, 58, 63 P.3d 1147, 1148 (2003). However, the fact-finder's "fact-based conclusions of law are entitled to deference, and . . . will not be disturbed if supported by substantial evidence." *Manwill v. Clark County*, 123 Nev. 238, 241, 162 P.3d 876, 879 (2007).

NRS 645.251 provides, in relevant part, that "[a] licensee is not required to comply with any principles of common law that may otherwise apply to any of the duties of the licensee as set forth in NRS 645.252, 645.253 and 645.254." NRS 645.252 sets forth the general duties of care and disclosure of real estate licensees. NRS 645.253 describes the duties of nondisclosure of licensees affiliated with the same brokerage. Lastly, NRS 645.254 provides additional duties of care, disclosure, and nondisclosure of licensees who have entered into a brokerage agreement to represent a client in a real estate transaction.

Although we conclude that NRS 645.251 alters the traditional landscape of liability with respect to real estate licensees, we disagree with Davis's and Platinum's contention that the statute precludes, in all instances, common law forms of liability, such as fraud. Simply put, NRS 645.251 does not state that real estate licensees are shielded from all forms of common law liability, and therefore, Davis's and Platinum's interpretation of NRS 645.251 is overbroad and improperly reads language into the statute. *See Szydel v. Markman*, 121 Nev. 453, 457, 117 P.3d 200, 202 (2005) ("When the language of a statute is clear on its face, this court will deduce the legislative intent from the words used.").

Nonetheless, NRS 645.251 expressly limits a real estate licensee's duties of care and disclosure to those specifically set forth in NRS 645.252-645.254. NRS 645.251 would be rendered meaningless if a party could circumvent this limitation by simply casting a claim for a violation of NRS 645.252-645.254 as a common law claim. We therefore conclude that NRS 645.251 precludes common law claims against real estate licensees to the extent that the type of conduct forming the basis of such a claim is the type of conduct proscribed in NRS 645.252-645.254. Stated differently, NRS 645.251 displaces common law forms of liability when the type of conduct complained of overlaps with the conduct covered by NRS 645.252-645.254. Thus, although NRS 645.251 does not abrogate all common law claims for a real estate li-

censee's wrongful conduct, such claims remain viable only if the type of conduct complained of is not covered by NRS 645.252-645.254.

The Doughertys' fraud-by-concealment claim is predicated on Davis's failure to disclose material information regarding their various real estate transactions. The duties of disclosure of real estate licensees are covered by NRS 645.252(1) and NRS 645.254(5). Thus, the type of conduct forming the basis of the Doughertys' fraud-by-concealment claim overlaps with the type of conduct covered by NRS 645.252(1) and NRS 645.254(5), and therefore, as a matter of law, this conduct cannot form the basis of a common law fraud-by-concealment claim against Davis. Consequently, we conclude that the district court erred in entering judgment on this claim. However, as substantial evidence supports the jury's finding in favor of the Doughertys on their NRS 645.257 claim against Davis for breach of the statutory duties set forth in NRS 645.252-645.254, the district court did not err in entering judgment, as to liability, on the statutory claim.

In contrast to the type of conduct forming the basis of the Doughertys' fraud-by-concealment claim, respondeat superior liability is not covered in NRS 645.252, 645.253, or 645.254. Indeed, those statutes have nothing to do with such liability. Platinum's contention that NRS 645.251 precludes its respondeat superior liability for Davis's wrongdoing is therefore without merit. Accordingly, because substantial evidence supports the jury's finding that Platinum is liable under a respondeat superior theory, the district court did not err in entering judgment, as to liability, on the Doughertys' NRS 645.257 claim against Platinum.

*The Doughertys' recoverable damages*

Davis contends that the district court erred in permitting the jury to award diminution damages to the Doughertys. Specifically, she asserts that the Doughertys' recovery should be measured by their out-of-pocket losses. Davis further argues that the diminution in the value of the Ping Property is an improper measure of the Doughertys' damages because the drop in value of the Ping Property was proximately caused by the decline in the Las Vegas real estate market, not her actions.[6]

---

[6]Davis also argues that the Doughertys waived any claim to damages in the purchase agreements for the Augusta Property and the Ping Property. This argument is meritless. The waiver provisions contained in the purchase agreements relate to claims arising from defects in the condition of the properties, not intentional torts or a breach of statutory duties.

On cross-appeal, the Doughertys argue that the district court erred in precluding their recovery of the carrying costs for the Ping Property. They further argue that the district court erred in determining that their recovery of these damages is barred by the economic loss doctrine.

As both parties' arguments require that we address the damages that are recoverable on the Doughertys' NRS 645.257 claims and the measure that should be used to compute those damages, we take up these issues together. "Whether a party is 'entitled to a particular measure of damages is a question of law' reviewed de novo." *Dynalectric Company v. Clark & Sullivan*, 127 Nev. 480, 483, 255 P.3d 286, 288 (2011) (quoting *Toscano v. Greene Music*, 21 Cal. Rptr. 3d 732, 736 (Ct. App. 2004)).

### NRS 645.257

With respect to the damages that may be recovered under NRS 645.257, the statute provides, in pertinent part:

> A person who has suffered damages as the proximate result of a licensee's failure to perform any duties required by NRS 645.252, 645.253 or 645.254 . . . may bring an action against the licensee for the recovery of the person's *actual damages*.

(Emphasis added.)

The Legislature did not define the term "actual damages," nor have we previously interpreted it. Typically, "actual damages" are defined as "[a]n amount awarded to a complainant to compensate for a proven injury or loss." *Black's Law Dictionary* 445 (9th ed. 2009). The term is often "[a]lso termed *compensatory damages*." *Id.* Thus, "actual damages" is simply another way of stating "compensatory damages." Indeed, the term is generally understood by courts to be synonymous with "compensatory damages," *see, e.g.*, *Saunders v. Taylor*, 50 Cal. Rptr. 2d 395, 398 (Ct. App. 1996), and therefore, this is how we believe it should be construed. *See Beazer Homes Nevada, Inc. v. Dist. Ct.*, 120 Nev. 575, 580-81, 97 P.3d 1132, 1135-36 (2004) ("When a legislature adopts language that has a particular meaning or history, rules of statutory construction . . . indicate that a court may presume that the legislature intended the language to have meaning consistent with previous interpretations of the language."). It follows that, linguistically, the term simply operates to distinguish compensatory damages from other broad types of damages, such as punitive damages. Accordingly, we conclude that although punitive damages may not be recovered for statutory claims brought pursuant to

NRS 645.257, the Legislature intended to permit the recovery of compensatory damages for such actions. Below, we address the appropriate measure of compensatory damages for the Doughertys' NRS 645.257 claims.

### Diminution damages

As previously noted, Davis contends that the Doughertys' compensatory damages should not be measured by their diminution damages, but instead should be ascertained by their out-of-pocket losses, which is a measure of damages used in fraud cases. While we agree that, under the particular facts of this case, it is appropriate to determine the Doughertys' compensatory damages under NRS 645.257 by general reference to the measure of damages for fraud, Davis's contention that this means the Doughertys' recovery is limited to their out-of-pocket losses does not withstand scrutiny.

To be sure, the out-of-pocket measure, which, in the misrepresentation context, is comprised of "the difference between what [the defrauded party] gave and what he actually received," is frequently used to compute the damages for fraud. *Collins v. Burns*, 103 Nev. 394, 398-99, 741 P.2d 819, 822 (1987). The benefit-of-the-bargain measure, which consists of "the value of what [the defrauded party] would have received had the representations been true, less what he actually received," is also often utilized to calculate damages in fraud cases. *Id.* at 398, 741 P.2d at 822. "Sometimes, however, neither the out-of-pocket nor benefit-of-the-bargain measure is particularly helpful or appropriate." *Strebel v. Brenlar Investments, Inc.*, 37 Cal. Rptr. 3d 699, 705 (Ct. App. 2006). As the California Court of Appeal has observed, these measures are often mistakenly portrayed "as being the sole antagonists on the battlefield of damages when at times neither is truly applicable." *Overgaard v. Johnson*, 137 Cal. Rptr. 412, 413 (Ct. App. 1977).

In *Strebel*, the court explained that a circumstance in which the out-of-pocket rule and the benefit-of-the-bargain measure may both be inapplicable is where, as here, "the facts that were fraudulently concealed . . . [have] nothing to do with the value of the [property]." 37 Cal. Rptr. 3d at 705. Accordingly, in *Strebel*, the court concluded that a homeowner who was fraudulently induced by his real estate agent into selling his home was properly awarded damages constituting the appreciation that he would have accrued had he not sold his home, rather than his more limited out-of-pocket damages. *Id.* at 706.

In reaching this conclusion, the *Strebel* court rejected the same argument that Davis advances here, namely, that "damages proximately caused by fraud are determined as of the date when the fraud took effect—not by a later increase or decline in value." *Id.* (internal quotation marks omitted). The court rejected this argu-

ment for many reasons. First and foremost, "measuring [the home-owner's] damages at the time of the sale would provide no compensation for the most significant portion of the loss he suffered as a result of defendants' fraud." *Id.* at 707. Next, the fraud was perpetrated by a real estate agent—a fiduciary that has a broad responsibility to compensate his or her clients. *Id.* at 708. Additionally, in contrast to situations involving a tortfeasor who merely acts with negligence, "[a]llowing recovery for lost appreciation . . . provide[s] a significant deterrent to a real estate agent fraudulently misleading prospective buyers under similar circumstances in the future." *Id.* Finally, the jury was correctly instructed on the issue of proximate cause, and substantial evidence supported the jury's finding that the homeowner's lost appreciation damages were substantially related to the defendants' fraud. *Id.* We find the *Strebel* court's analysis sound and instructive on the appropriate measure of compensatory damages in this case because measuring damages based on loss of appreciation is conceptually analogous to measuring damages based on diminution.

Here, as in *Strebel*, the vast majority of the Doughertys' losses were incurred after the date of Davis's wrongdoing. Rigidly measuring the Doughertys' damages as of the date of Davis's transgressions would thus defeat the irrefutable goal of compensatory damages. *See Hanneman v. Downer*, 110 Nev. 167, 172-73, 871 P.2d 279, 283 (1994) ("[D]amages are awarded to make the aggrieved party whole . . . ."). And, as in *Strebel*, Davis is a fiduciary with a heightened responsibility to compensate the clients who she deceived. *See Holland Rlty. v. Nev. Real Est. Comm'n*, 84 Nev. 91, 97, 436 P.2d 422, 425 (1968) (the consequences of a real estate licensee's breach of trust are the same as those "that are provided for a disloyal or recreant trustee"); *Pepitone v. Russo*, 134 Cal. Rptr. 709, 711 (Ct. App. 1976) ("[T]he faithless fiduciary is obligated to make good the full amount of the loss of which his breach of faith is a cause."). Finally, as in *Strebel*, Davis did not act with mere negligence; rather, the record shows that she acted intentionally, and she will therefore be deterred from misleading clients in the future if she is made to compensate the Doughertys for their diminution damages. *Cf. Safeco Ins. Co. v. J & D Painting*, 21 Cal. Rptr. 2d 903, 907 (Ct. App. 1993) (rejecting award of diminution damages for a negligence claim); *Goodrich & Pennington v. J.R. Woolard*, 120 Nev. 777, 781, 101 P.3d 792, 795 (2004) (indicating that liability for negligent misrepresentation "may not extend to losses arising from a subsequent downturn in the real estate market"). Accordingly, we conclude that the district court did not err in determining that the diminution

in the value of the Ping Property was an appropriate measure of compensatory damages for the Doughertys' NRS 645.257 claims.[7]

### Consequential damages

We now turn to the Doughertys' contention that the district court erred in precluding their recovery of the carrying costs for the Ping Property. The Doughertys assert that these costs constitute consequential damages that may be recovered, in addition to diminution damages, in order to fully compensate them for their losses.

As a leading remedies treatise explains, in order to fully and fairly compensate the victim of fraud, he or she "may recover special or consequential damages caused by the misrepresentation, in addition to the recovery under the appropriate general damages measure." 2 Dan B. Dobbs, *Law of Remedies* § 9.2(3) (2d ed. 1993).

> Consequential damages include items of expense reasonably incurred to minimize the effects of the fraud, damages caused to other property suffered because of the fraud, travel expenses incurred to deal with the problem, commissions paid or added tax burdens, and other items of loss or expense not adequately reflected in the general damages recovery based on market value of the property itself.

*Id.* (footnotes omitted).

Here, the carrying costs for the Ping Property are damages that the Doughertys incurred to minimize the effects of Davis's deceptions. It was preeminently reasonable for the Doughertys to obtain property insurance for the Ping Property, pay the taxes and mortgage on the property, and maintain the property. Indeed, if they had not done so, they would likely be deemed to have failed to mitigate their damages. The Doughertys' carrying costs are thus consequential damages that are a recoverable component of their compensatory damages.[8]

---

[7]We caution that a party seeking to recover diminution damages may not unfairly profit from a defendant's wrongdoing by delaying filing suit during an economic downturn. *See Strebel*, 37 Cal. Rptr. 3d at 709. Davis does not, however, advance any argument that the Doughertys did so here.

We also note that in order to prevent a double recovery, any damages the Doughertys are awarded should be reduced by the amount of payments that they received from renting the Ping Property. *See generally Elyousef v. O'Reilly & Ferrario, LLC*, 126 Nev. 441, 444, 245 P.3d 547, 549 (2010) ("[A] plaintiff can recover only once for a single injury.").

[8]We note that consequential damages may not be awarded when they are duplicative of the general damages awarded—that is, when they "have been ac-

### The economic loss doctrine

We also agree with the Doughertys' contention that the district court erred in determining that their recovery of these carrying costs is barred by the economic loss doctrine. The economic loss doctrine is a rule of judicial creation that, broadly speaking, " 'marks the fundamental boundary between contract law, which is designed to enforce the expectancy interests of the parties, and tort law, which imposes a duty of reasonable care and thereby [generally] encourages citizens to avoid causing physical harm to others.' " *Terracon Consultants v. Mandalay Resort*, 125 Nev. 66, 72-73, 206 P.3d 81, 86 (2009) (alteration in original) (quoting *Calloway v. City of Reno*, 116 Nev. 250, 256, 993 P.2d 1259, 1263 (2000), *overruled on other grounds by Olson v. Richard*, 120 Nev. 240, 241-44, 89 P.3d 31, 31-33 (2004)). Consistent with this purpose, the doctrine primarily functions to bar the recovery of purely monetary losses in certain products liability and unintentional tort actions. *Id.* at 73, 206 P.3d 86.

The economic loss doctrine does not, however, bar the recovery of purely economic losses when the defendant intentionally breaches a duty that is imposed independently of the obligations arising from contract. *Bernard v. Rockhill Dev. Co.*, 103 Nev. 132, 135, 734 P.2d 1238, 1240 (1987); *see Giles v. General Motors Acceptance Corp.*, 494 F.3d 865, 879 (9th Cir. 2007) (meticulously analyzing Nevada's economic loss doctrine jurisprudence and explaining that in Nevada, as in most jurisdictions, the doctrine does not bar claims "where the defendant had a duty imposed by law rather than by contract and where the defendant's intentional breach of that duty caused purely monetary harm to the plaintiff"). After all, it is often the case that claims stemming from a defendant's intentional wrongdoing, " 'such as fraud and conversion[,] *exist* to remedy purely economic losses.' " *Id.* at 875 (quoting *Grynberg v. Questar Pipeline Co.*, 70 P.3d 1, 11 (Utah 2003)).

Here, although the parties had agreements regarding the Augusta Property and the Ping Property, the Doughertys' NRS 645.257 claims are not based upon a breach of an obligation arising from those agreements. Rather, the Doughertys' NRS 645.257 claims are predicated upon Davis's intentional breach of separate duties, distinct from those arising from the parties' contractual

---

counted for already by the general damages recovery." 2 Dan B. Dobbs, *Law of Remedies* § 9.2(3) (2d ed. 1993). Here, the carrying costs of the Ping Property compensate the Doughertys for a component of their losses that are not reflected by the diminution measure. As such, the Doughertys' carrying costs are not duplicative.

dealings, not to violate the statutory provisions governing real estate licensees. The economic loss doctrine, therefore, does not apply to the Doughertys' NRS 645.257 claims. Consequently, we conclude that the district court erred in precluding the Doughertys from recovering the carrying costs for the Ping Property.

*The Doughertys' recovery of attorney fees pursuant to the parties' listing and purchase agreements*

The Doughertys next argue that the district court erred in determining that they are not entitled to an award of attorney fees pursuant to the listing and purchase agreements for the Augusta Property and the purchase agreement for the Ping Property. In particular, they assert that although the district court awarded them attorney fees under the offer of judgment rule, they are entitled to an additional award of fees under the terms of these agreements for their successful defense of Davis's and Platinum's breach of contract actions.

While the district court's award of attorney fees is typically reviewed for an abuse of discretion, *Kahn v. Morse & Mowbray*, 121 Nev. 464, 479, 117 P.3d 227, 238 (2005), our plenary review is implicated when questions of law, such as in the interpretation of a contract, are at issue. *Benchmark Insurance Company v. Sparks*, 127 Nev. 407, 411, 254 P.3d 617, 620 (2011); *Valley Elec. Ass'n v. Overfield*, 121 Nev. 7, 9, 106 P.3d 1198, 1199 (2005).

In general, a district court may not award "attorney fees . . . unless authorized to do so by a statute, rule or contract." *U.S. Design & Constr. v. I.B.E.W. Local 357*, 118 Nev. 458, 462, 50 P.3d 170, 173 (2002). Parties are free to provide for attorney fees by express contractual provisions. *See Musso v. Binick*, 104 Nev. 613, 614, 764 P.2d 477, 477 (1988). The objective in interpreting an attorney fees provision, as with all contracts, "is to discern the intent of the contracting parties." *Cline v. Rocky Mountain, Inc.*, 998 P.2d 946, 949 (Wyo. 2000). "[T]raditional rules of contract interpretation [are employed] to accomplish that result." *Id.* Therefore, the initial focus is on whether the language of the contract is clear and unambiguous; if it is, the contract will be enforced as written. *Ellison v. C.S.A.A.*, 106 Nev. 601, 603, 797 P.2d 975, 977 (1990).

Here, the Augusta Property listing agreement provides:

ATTORNEYS FEES: In the event suit is brought by either party to enforce this Agreement, the prevailing party is entitled to court costs and reasonable attorneys fees.

Likewise, the purchase agreements for the Augusta Property and the Ping Property each state:

> Should any party hereto retain counsel for the purpose of initiating litigation to enforce or prevent the breach of any provision hereof, or for any other judicial remedy, then the prevailing party shall be entitled to be reimbursed by the losing party for all costs and expenses incurred thereby, including, but not limited to, reasonable attorneys fees and costs incurred by such prevailing party.

The language of these agreements is clear and unambiguous. All three agreements provide, in straightforward language, that in the event suit is brought to enforce the agreements, the prevailing party is entitled to attorney fees incurred in defense or prosecution of the action. Thus, because the Doughertys successfully defended against Davis's and Platinum's breach of contract actions, pursuant to the clear language of these agreements, the Doughertys are entitled to recover reasonable attorney fees incurred in defense of those particular claims. *See Valley Elec. Ass'n*, 121 Nev. at 10, 106 P.3d at 1200 (explaining that parties "prevail" if they succeed on any substantial aspect of the case and noting that the term "prevailing party" "is broadly construed so as to encompass plaintiffs, counterclaimants, and defendants"). Accordingly, we conclude that the district court erred in denying the Doughertys' motion for attorney fees under these agreements.[9]

## CONCLUSION

We reverse the district court's judgment on the Doughertys' fraud-by-concealment claim. We affirm the district court's judgment, as to liability, on the Doughertys' NRS 645.257 claims against Davis and Platinum, but vacate the damages awarded and remand those claims for further proceedings consistent with this opinion. The district court's judgment is affirmed in all other respects. Finally, we reverse in part the district court's post-judgment order partially denying the Doughertys' motion for attorney fees and direct the district court to determine the reasonable amount of attorney fees to which the Doughertys are entitled pursuant to the parties' listing and purchase agreements.

HARDESTY and PARRAGUIRRE, JJ., concur.

---

[9]We instruct the district court that the Doughertys are only entitled to receive additional fees beyond those that they already received under the offer of judgment rule. In other words, the court should ensure that the Doughertys do not receive a double recovery of attorney fees.