139 Nev., Advance Opinion 26

# IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| LUCKY LUCY D LLC, D/B/A LUCKY CLUB CASINO & HOTEL, Appellant, vs. LGS CASINO LLC; LUCKY CLUB, LLC; AND 3227 CIVIC CENTER, LLC, Respondents. | No. 83833 **FILED** AUG 24 2023 ELIZABETH A. BROWN CLERK OF SUPREME COURT BY_____ CHIEF DEPUTY CLERK |
| LUCKY LUCY D LLC, D/B/A LUCKY CLUB CASINO & HOTEL, Appellant, vs. LGS CASINO LLC; LUCKY CLUB, LLC; AND 3227 CIVIC CENTER, LLC, Respondents. | No. 84257 |

Consolidated appeals from district court orders on motions for summary judgment and a post-judgment award of attorney fees and costs in a contract action. Eighth Judicial District Court, Clark County; Timothy C. Williams, Judge.

*Affirmed in part and reversed in part.*

McNutt Law Firm, P.C., and Daniel R. McNutt and Matthew C. Wolf, Las Vegas,
for Appellant.

The Wright Law Group, P.C., and John Henry Wright, Las Vegas,
for Respondents.

23-27672

BEFORE THE SUPREME COURT, CADISH, PICKERING, and BELL, JJ.

*OPINION*

By the Court, BELL, J.:

In these consolidated appeals, we consider whether business actions taken in response to the COVID-19 pandemic violated an ordinary course covenant in an asset purchase agreement. Generally, an ordinary course covenant requires the seller to operate its business in the usual manner between the time the agreement is signed and closing. Such a covenant was included in the purchase agreement for the sale of a casino and hotel at issue here, and when the seller closed the casino and laid off employees due to the pandemic and the Governor's resulting emergency directive, the buyer asserted breach of the covenant.

In granting a motion for summary judgment in favor of the buyer, the district court agreed that the seller had breached the ordinary course covenant by closing the casino and hotel in response to the COVID-19 pandemic. We hold the district court erred in granting summary judgment for the buyer. In closing the casino and hotel pursuant to the emergency directive, the seller was merely following the law so as to maintain its gaming licenses and thus did not materially breach the agreement. Accordingly, we reverse that portion of the district court's order.

The district court also denied the seller's motion for summary judgment based on the buyer's failure to obtain the necessary gaming licenses. Because the record reflects that the buyer's applications for gaming licenses were delayed—not refused—we affirm that portion of the district court's order.

 

Finally, the district court granted the buyer's motion for attorney fees and costs as the prevailing party under the agreement. Because we reverse the portion of the district court's order granting summary judgment to the buyer, we also reverse the order granting attorney fees and costs.

## BACKGROUND

The relevant facts in this case are undisputed. The Lucky Club Casino & Hotel, located in North Las Vegas, is owned by Appellant Lucky Lucy D, LLC. In April 2019, Lucky Lucy entered into an agreement to sell the property to Respondent LGS Casino LLC. The agreement required LGS to make an earnest money deposit of $350,000. The agreement also provided for a forty-five-day due diligence period. After the expiration of a forty-five-day due diligence period, the earnest money deposit became refundable only in the event of a "material default" by Lucky Lucy, per section 1.4(b) of the agreement. LGS provided the earnest money deposit in May 2019.

The agreement also contained an ordinary course covenant: under section 2.2(i), Lucky Lucy warranted that it would, before closing, maintain the property and conduct related business "in a manner generally consistent with the manner in which [Lucky Lucy] has operated and maintained the [p]roperty and [a]ssets prior to the date hereof." Further, while the sale was pending, section 1.5(c) required Lucky Lucy to remain "in material compliance with all applicable licensing and gaming regulations." Closing was contemplated to occur within a year after the due diligence period ended.

In March 2020, in response to the COVID-19 pandemic, the Governor issued Declaration of Emergency Directive 002, mandating closure of all nonessential businesses. With limited exceptions, the closures

included casinos, restaurants, hotels, and nonessential governmental agencies. Lucky Lucy complied with the directive and temporarily closed the Lucky Club.

In an email to LGS, as required by section 2.4(c) of the agreement, Lucky Lucy provided notice that the Governor's emergency directive materially affected the business. LGS then sent Lucky Lucy a notice of breach and demanded Lucky Lucy cure the breach as provided in sections 2.2(i) and 2.2(q) (warrantying that "[s]ince the most recent financial statements delivered to [respondents], there have not been any material adverse changes in the business, financial condition, operations, results of operations, or future prospects of [Lucky Lucy]"). Given the continuing closure directives from the Governor, Lucky Lucy was unable to reopen the Lucky Club within the agreement's fifteen-day cure period.

The pandemic affected LGS's duties under the agreement as well. The agreement required LGS to take "all steps necessary including obtaining necessary approvals from the Nevada Gaming Commission and other governmental authorities (the 'Gaming Approvals') to ensure" closing within one year following the due diligence period. Due to the directive, however, the Nevada Gaming Commission vacated a required class for one of LGS's members and continued a previously scheduled May 2020 hearing where LGS had planned to obtain gaming license approval. The actions of the Gaming Commission prevented the sale from moving forward at that time.

After these obstacles arose, LGS terminated the agreement on April 14, 2020. LGS's termination letter did not reference any uncured breach by Lucky Lucy. The letter focused on the impossibility of completing the transaction. After termination of the agreement, the parties were

unable to agree on who was entitled to the earnest money deposit. LGS sued Lucky Lucy for return of the deposit, alleging various contract claims. Lucky Lucy answered and counterclaimed, alleging breach of contract and seeking declaratory relief. The district court ultimately granted summary judgment for LGS and denied Lucky Lucy's competing summary judgment motion. The district court later granted LGS's motion for attorney fees and costs pursuant to the parties' purchase agreement. Lucky Lucy now appeals.

## DISCUSSION

*Lucky Lucy did not materially breach the agreement*

Lucky Lucy argues the district court erroneously determined Lucky Lucy breached section 2.2(i) of the agreement. Reviewing de novo, *Wood v. Safeway, Inc.*, 121 Nev. 724, 729, 121 P.3d 1026, 1029 (2005) (reviewing summary judgments de novo), we agree.

As noted, section 2.2(i) of the agreement contained an ordinary course covenant requiring Lucky Lucy to maintain the property and conduct the business "in a manner generally consistent with the manner in which [Lucky Lucy] has operated and maintained" the property and business before the agreement. The relevant question here is whether temporarily closing the property pursuant to the Governor's directive constituted a material breach of the agreement that permitted LGS to seek a return of its earnest money deposit. To answer that question, we look to the plain language of the ordinary course covenant. *Davis v. Beling*, 128 Nev. 301, 321, 278 P.3d 501, 515 (2012) (holding that in interpreting contracts, "the initial focus is on whether the language of the contract is clear and unambiguous; if it is, the contract will be enforced as written").

First, as the party asserting a breach of the agreement, and of the ordinary course covenant specifically, LGS carried the burden to

SUPREME COURT
OF
NEVADA

(O) 1947A

demonstrate Lucky Lucy's actions deviated from how it had generally conducted its business in the past. *See Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892, 899 (9th Cir. 2013) ("Under Nevada law, 'the plaintiff in a breach of contract action [must] show (1) the existence of a valid contract, (2) a breach by the defendant, and (3) damage as a result of the breach.'" (alteration in original) (quoting *Saini v. Int'l Game Tech.*, 434 F. Supp. 2d 913, 919-20 (D. Nev. 2006))); *AB Stable VIII LLC v. MAPS Hotels & Resorts One LLC*, C.A. No. 2020-0310-JTL, 2020 WL 7024929, at *50 (Del. Ch. Nov. 30, 2020), *aff'd*, 268 A.3d 198 (Del. 2021) (holding that where a buyer claims that a seller has breached an ordinary course covenant, the buyer carries the burden of demonstrating a breach).

Next, because the ordinary course covenant is limited to the manner in which Lucky Lucy operated before the parties signed the agreement, the court may look only to how Lucky Lucy has operated in the past. *See Level 4 Yoga, LLC v. CorePower Yoga, LLC*, C.A. No. 2020-0249-JRS, 2022 WL 601862, at *24 (Del. Ch. Mar. 1, 2022) (holding that where "an ordinary course provision includes the phrase 'consistent with past practice' or a similar phrase," the court looks only to how the specific company has operated in the past (quoting *Snow Phipps Grp., LLC v. KCAKE Acq., Inc.*, C.A. No. 2020-0282-KSJM, 2021 WL 1714202 at *38 (Del. Ch. Apr. 30, 2021))). The ordinary course covenant at issue here, however, also broadly provides that Lucky Lucy need only conduct its business in a manner that is "*generally* consistent" with the manner in which it had done so in the past. "Generally," is defined as "in a general manner," or "in disregard of specific instances and with regard to an overall picture." *Generally, Merriam Webster's Collegiate Dictionary* 521 (11th ed. 2007).

In reviewing Lucky Lucy's actions in response to the COVID-19 pandemic, we conclude Lucky Lucy conducted the business in a manner that was generally consistent with the manner in which it had done so in the past. Under NRS 463.615(1)-(2), if any gaming company "does not comply with the laws of this state and the regulations of the [Gaming] Commission, the Commission may, in its discretion . . . [r]evoke, limit, condition or suspend the license" of the company or fine the company "in accordance with the laws of this state and the regulations of the [Gaming] Commission." And under Section 3.14 of the agreement, "[t]he parties further agree that if anything in this [a]greement is in violation or contravention of any gaming laws that such provision shall be null and void."

Further, the Governor's Emergency Directives ordering the temporary closure of casinos carried with them the force of law for the duration of the state of emergency. *See* Nevada's COVID-19 Declaration of Emergency Directive 002; *see also generally* NRS 414.060-414.070 (listing the governor's powers during a state of emergency, including the power to enforce all laws and regulations relating to the emergency). Because Lucky Lucy previously complied with Nevada laws and maintained its gaming licensing, we conclude LGS failed to meet its burden in establishing Lucky Lucy's actions in response to the COVID-19 pandemic were not generally consistent with Lucky Lucy's prior actions. Lucky Lucy maintained the property and was able to reopen on June 4, 2020, once certain COVID restrictions were lifted—in fact, Lucky Lucy reported increased revenue

after reopening. Accordingly, Lucky Lucy did not materially default under section 1.4(b) of the agreement.[1]

Additionally, Lucky Lucy held the property off the market for nearly a year after the conclusion of the due diligence period. During that time, LGS had the exclusive right to purchase the Lucky Club. The terms of the contract support the conclusion that the earnest money deposit was intended to be compensation for keeping the property off the market, refundable only if Lucky Lucy materially breached the agreement. As LGS failed to establish a material breach of the agreement attributable to Lucky Lucy, the earnest money deposit was not refundable to LGS under section 1.4(b) and Lucky Lucy, not LGS, was entitled to receive the earnest money deposit from the title company. We conclude the district court erred in granting LGS's motion for summary judgment and denying Lucky Lucy's motion for summary judgment as to the earnest money deposit and reverse to that extent.

*LGS did not breach the agreement by failing to obtain the necessary gaming licenses*

Lucky Lucy asserts that LGS failed to obtain the necessary gaming licenses and bore the risk of default for failing to obtain the licenses. Reviewing de novo, *see Wood*, 121 Nev. at 729, 121 P.3d at 1029, we disagree.

While a buyer typically bears the risk of default where it cannot obtain governmental licensing, *see Nebaco, Inc. v. Riverview Realty Co.*, 87 Nev. 55, 58, 482 P.2d 305, 307 (1971), the record does not reflect that LGS's

---

[1]LGS also does not come to terms with section 1.5(e), which would cast Lucky Lucy in material breach due to a post-due-diligence period financial change only if that change was "within Seller's control," which the pandemic was not.

gaming license applications were denied. The Nevada Gaming Control Board delayed the compliance classes and informed LGS that its application did not qualify to be placed on the May 2020 agenda. Thus, the record reflects the pandemic and the Governor's directives caused a delay in obtaining approval—not a refusal to approve.

Moreover, the parties used a traditional qualifier, "commercially reasonable efforts," in section 1.11 of their agreement. with regard to the effort level LGS was required to exert to obtain the necessary gaming approvals. *See Akorn, Inc. v. Fresenius Kabi AG*, C.A. No. 2018-0300-JTL, 2018 WL 4719347, at *86-87 (Del. Ch. Oct. 1, 2018), *aff'd*, 198 A.3d 724 (Del. 2018) (outlining the five common standards, including "best efforts," "reasonable best efforts," "reasonable efforts," "commercially reasonable efforts," and "good faith efforts"). Thus, in obtaining these approvals, LGS was not required "to take any action that would be commercially detrimental, including the expenditure of material unanticipated amounts or management time." *Id.* at 87 (defining "commercially reasonable efforts"). Accordingly, we conclude LGS did not need to go beyond the efforts made here in seeking license approval.

Because the record demonstrates LGS's gaming licenses were delayed—not refused—we conclude the district court did not err by denying Lucky Lucy's summary judgment motion as to the breach asserted with respect to the gaming licenses. It is not clear from the record whether Lucky Lucy's counterclaims sought relief beyond the award to it of the earnest money deposit but, to the extent Lucky Lucy asserted and sought summary judgment on such claims, we affirm the denial of summary judgment as to them.

SUPREME COURT
OF
NEVADA

(O) 1947A

*Attorney fees and costs*

Lastly, because we reverse the district court's order granting summary judgment in favor of LGS, we necessarily reverse the attorney fees and costs award to LGS as the prevailing party. *See Bower v. Harrah's Laughlin, Inc.*, 125 Nev. 470, 494-95, 215 P.3d 709, 726 (2009) ("[I]f we reverse the underlying decision of the district court that made the recipient of the costs the prevailing party, we will also reverse the costs award.").

## CONCLUSION

Lucky Lucy did not violate the agreement's ordinary course covenant when it closed the Lucky Club as mandated by the Governor's emergency directive. Because the district court erred in granting LGS's motion for summary judgment and refunding the earnest money deposit to LGS, we reverse that portion of the district court's order and conclude that Lucky Lucy is entitled to retain the earnest money deposit. We further conclude the record reflects LGS's gaming licenses were delayed, not refused. Accordingly, we affirm the portion of the district court's order denying Lucky Lucy's motion for summary judgment to the extent it sought relief beyond the award to it of the earnest money deposit. Finally, because we reverse the district court's grant of summary judgment in favor of LGS, we also reverse the award of attorney fees and costs to LGS.

_____, J.
Bell

We concur:

_____, J.
Cadish

_____, J.
Pickering

SUPREME COURT
OF
NEVADA

(O) 1947A

10