# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 07-3899

———————

Cedar Rapids Television Company,    \*
d/b/a KCRG-TV9,    \*
    \*
    Appellant,    \*
    \*  Appeal from the United States
    v.    \*  District Court for the
    \*  Northern District of Iowa.
MCC Iowa LLC;    \*
MCC Illinois LLC,    \*
    \*
    Appellees.    \*

———————

Submitted: November 11, 2008
Filed: April 3, 2009

———————

Before MELLOY, BOWMAN, and SMITH, Circuit Judges.

———————

SMITH, Circuit Judge.

Cedar Rapids Television Company d/b/a KCRG-TV9 (KCRG) filed a complaint against MCC Iowa LLC and MCC Illinois LLC (collectively "Mediacom"), seeking a declaratory judgment that its September 29, 2005 letter to Mediacom constitutes a sufficient notice of termination under the parties' Retransmission Consent Agreement. At the conclusion of a bench trial, the district court[1] granted declaratory judgment in

———————

[1]The Honorable Linda R. Reade, Chief Judge, United States District Court for the Northern District of Iowa.

favor of Mediacom on KCRG's complaint, finding that the letter did not express KCRG's definite intent to terminate the Agreement. KCRG appeals, and we now affirm.

## I. *Background*

KCRG is a television station and an American Broadcasting Company affiliate that serves a designated marketing area (DMA) consisting of 21 Iowa counties and four major cities in Iowa. There are approximately 160 different cable systems within KCRG's DMA, including Mediacom. The Federal Communications Commission (FCC) regulates the relationship between commercial broadcast television stations, such as KCRG, and cable companies, such as Mediacom. This case concerns the determination of relationship status between KCRG and Mediacom based upon the parties' communications.

All commercial television stations in the United States must elect either "must-carry" status or "retransmission consent" status with cable companies in the stations' DMA. 47 C.F.R. § 76.64(f)(2) ("Commercial television stations are required to make elections between retransmission consent and must-carry status . . . at three year intervals . . . ."). If a station is a "must-carry" station, the cable company is required to carry the station's signal. 47 U.S.C. § 534; 47 C.F.R. § 76.56(b). If the station is a "retransmission consent" station, the cable company has received the station's permission to transmit the station's signal in exchange for some agreed-upon compensation from the cable company. 47 U.S.C. § 325(b); 47 C.F.R. § 76.64. When retransmission consent status is in effect, the cable company cannot carry the local station's signal without the consent of the local station. 47 U.S.C. § 325(b)(1); 47 C.F.R. § 76.64(a). Retransmission consent is typically granted through a retransmission consent contract.

Each commercial television station must elect either "must-carry" status or "retransmission consent status" every three years, and the Code of Federal Regulations

sets the cycle years. 47 U.S.C. § 325(b)(3)(B); 47 C.F.R. § 76.64(f)(2). Stations were required to elect by October 1, 2005, for the period of 2006, 2007, and 2008. The commercial television stations had to make the next election by October 1, 2008. An election must be in writing and sent to the cable companies via certified United States mail. 47 C.F.R. § 76.64(h). If a station fails to send a notice of election, the default status is must-carry status. *Id*. § 76.64(f)(3).

In addition to the three-year election cycle, stations and cable systems may have retransmission consent contracts that cover all or part of the three-year election period. Thus, the retransmission consent contract's period need not coincide with the election cycle. Such contracts must be in writing and must "specify the extent of the consent being granted." *Id*. § 76.64(j). The parties to the contract are free to choose the duration of the "retransmission consent" contract, and they are free to modify their contract during the period of effectiveness. Commercial television stations and cable companies are obligated, pursuant to federal regulations, to negotiate retransmission consent contracts in good faith. 47 U.S.C. § 325(b)(3)(C); 47 C.F.R. § 76.65(a).

If a commercial television station elects retransmission consent status with a particular cable company and then fails to enter into a retransmission consent contract with that company, the station's signal may not be broadcast on the cable network. A retransmission consent contract is the exclusive means for a commercial television station to have its signal broadcast on a cable system if the station has elected retransmission consent instead of must-carry status for that particular cable company.

On May 16, 1997, TCI Cable Management Corporation (TCI) entered into a Retransmission Consent Agreement ("Agreement") with KCRG. TCI drafted the Agreement, which provides, in relevant part:

> 5. *Term*. The term of this Agreement shall commence on the date hereof and shall expire on December 31, 2001 (the "Initial Term"). This

Agreement and the election set forth in Paragraph 1 hereof shall automatically renew for successive six (6)-year periods after the expiration of the Initial Term (each a "Renewal Term"); provided, however, that either party may terminate this Agreement effective as of the end of the Initial Term or any Renewal Term upon six (6) months' prior written notice to the other party or as otherwise provided in this Agreement.

In June 2001, Mediacom became the successor-in-interest to TCI. On October 5, 2001, Mediacom informed KCRG that Mediacom was assuming all of the obligations of the Agreement. Because KCRG elected retransmission consent status in 1999 (for the election period of 2000, 2001 and 2002), Mediacom either had to assume the obligations of the Agreement or enter into negotiations for a new retransmission consent arrangement. When Mediacom assumed the Agreement, the Agreement had already automatically renewed once because neither TCI nor KCRG had given the other written notice six months prior to December 31, 2001. Consequently, the Agreement remained in place for another six-year period, i.e. until December 31, 2007.

On May 5, 2003, Jane Belford, Vice President of Programming and Legal Affairs for Mediacom Communications Corporation, sent a letter to John Phelan, Vice President and General Manager of KCRG. Belford, who also serves as in-house counsel for Mediacom and negotiates contracts with large programmers, stated in the letter to Phelan that

> [s]ince neither you nor TCI gave notice that you wanted to terminate the [A]greement within the time period stated in the contract, the contract automatically renewed at the end of the [I]nitial [T]erm. And since [Mediacom] agreed to assume the terms of the [A]greement, we have been living under that contract ever since. The expiration date of the contract is now December 31, 2007.

The May 5, 2003 letter proposed amendments to the retransmission agreement affecting two topics: (1) changing the list of headends[2] to reflect that Mediacom owned different systems than TCI had owned and (2) increasing the number of promotional spots from 30 per month to 50 per month.[3] The May 5, 2003 letter also addressed KCRG's concern about the emergency alert system (EAS), but Belford concluded that Mediacom was unable to change the EAS procedure at that time. Phelan accepted the amendments on behalf of KCRG.

On July 16, 2004, Belford sent Phelan another letter. That letter reiterated that the "expiration date" of the Agreement was December 31, 2007. But the main point of the July 16, 2004 letter was to "add a digital component" to the Agreement. On August 3, 2005, Phelan agreed to the amendments set forth in the July 16, 2004 letter, and the parties added five new paragraphs to the Agreement.

On September 29, 2005, Phelan sent approximately 160 notices of election by certified United States mail to the various companies that serve KCRG's DMA. KCRG elected must-carry status in the majority of the 160 election notices. KCRG only sent five notices in which it elected retransmission consent status. The retransmission consent elections went to Mediacom, Cedar Falls Utilities, McLeod Communications, Direct TV, and Echo Star. KCRG chose to elect retransmission consent status with these five companies because the cable companies were able to give KCRG some

---

[2]A "headend" is the structure or equipment that a cable company has that receives television signals and satellite signals. The structure has wires going out from it to the individual homes to deliver the signals to the subscribers. In 2007, Mediacom headends reached a much larger number of subscribers than Mediacom had previously reached because it installed additional fiber lines.

[3]The Agreement entitles KCRG to a promotional schedule, which allows it to advertise and promote KCRG on various cable channels. The Agreement also requires Mediacom to spend a certain amount of money advertising on KCRG.

benefits, including promotional schedules, a CNN Headline News Local Edition insert, a "guaranteed ad-buy," and a subscriber-per-month cash payment.

In the days leading up to the October 1, 2005 must-carry/retransmission consent election deadline, Belford received notices of election from about 758 commercial television stations. About two-thirds of the 758 stations elected retransmission consent for at least part of their DMAs. In total, Belford and her assistant received about 15,000 various elections. Belford personally read each election notice, and she and her assistant entered them into a database.

The major dispute in this case arises from a letter sent by Phelan to Mediacom just prior to the October 1, 2005 deadline. Phelan, on KCRG's behalf, elected retransmission consent. We must decide whether that letter sufficed to do anything more. Specifically, we must determine whether the letter contained notice of an intent to *terminate* the retransmission agreement. The September 29, 2005 letter from Phelan to Mediacom ("2005 Letter") contained the subject line "Retransmission Consent" and provided:

> This letter will notify you, pursuant to [47 U.S.C. § 325(b)] and [47 C.F.R. § 76.64], that television station [KCRG] elects retransmission consent status on your cable systems detailed on Attachment "A" for the three-year election cycle commencing on January 1, 2006 and ending on December 31, 2008.
>
> As you know, your cable system currently carries [KCRG] pursuant to [the Agreement]. [The Agreement] is set to expire on December 31, 2007. Accordingly, in order to ensure that your cable subscribers continue to receive [KCRG], we look forward to having the opportunity to discuss with you mutually satisfactory terms under which [KCRG's] retransmission consent may be extended to your cable system upon the expiration of the current [A]greement.

The first paragraph of the 2005 Letter served as KCRG's notice of election for the election cycle of 2006, 2007, and 2008, and advised Mediacom that KCRG elected retransmission consent status for that period. Of the approximately 160 notices sent to cable companies by Phelan on September 29, 2005, only this 2005 Letter contained the second paragraph; the second paragraph is unnecessary to effectuate election under 47 C.F.R. § 76.64. Each of the other approximately 159 notices only contained the first paragraph. But, according to Belford, it is not uncommon for her to receive other information from commercial television stations in election notices, aside from the actual election itself.

In 2007, Doug Frank became Mediacom's manager in Cedar Rapids. In May 2007, Phelan invited Frank to lunch for two main reasons: (1) to introduce himself and (2) to inform Frank that the Agreement was "off cycle" and that KCRG had given notice that it would expire on December 31, 2007. On May 9, 2007, the two had lunch during which Frank told Phelan that Frank was unaware that the Agreement was "off cycle" and was also unaware that KCRG had given Mediacom notice of the Agreement's termination. The two discussed negotiating the Agreement, but Frank advised Phelan to discuss negotiating the Agreement with Belford. Phelan never contacted Belford prior to July 23, 2007.

On July 23, 2007, Phelan attempted to contact Belford to discuss the Agreement. On that date, they spoke on the telephone for about three minutes. Belford was not prepared to talk about the Agreement because she had not reviewed her KCRG file prior to the conversation. At that time, Belford informed Phelan that she did not recall receiving any notice from KCRG that it chose to terminate the Agreement. The two also briefly discussed the EAS procedure.

On July 24, 2007, Belford sent Phelan a letter via certified United States mail ("2007 Letter"). On July 27, 2007, Phelan received the 2007 Letter. It provided, in part:

Thank you for your telephone call yesterday. I have had the opportunity to review my file, and I note that paragraph 5 of the [Agreement] says:

> The term of this Agreement shall commence on the date hereof and shall expire on December 31, 2001 (the "Initial Term"). This Agreement and the election set forth in Paragraph 1 hereof shall automatically renew . . . provided, however, that either party may terminate this Agreement effective as of the end of the Initial Term or any Renewal Term upon six (6) months' prior written notice to the other party . . . .

Since neither party notified the other 6 months prior to the expiration of the Initial Term that they wished to terminate the [A]greement, the [A]greement automatically renewed for a Renewal Term that is to expire on December 31, 2007. However, if one of us wished to terminate the [A]greement in its entirety as of December 31, 2007, we would have had to provide written notice to the other before June 30, 2007. I have not sent such notice to you, and to the best of my knowledge, we have received no such written notice from you. Absent such notices, the [A]greement will again automatically renew, and the new termination date will be December 31, 2013. If your records show otherwise, please let me know.

After sending the 2007 Letter, Belford received no written response from Phelan. Belford remained unaware that Phelan was relying on the second paragraph of the 2005 Letter as KCRG's notice of termination until KCRG filed the instant lawsuit on October 31, 2007.

Phelan made several unsuccessful efforts to communicate with Belford about the dispute. As a result, KCRG commenced the instant lawsuit, seeking a declaratory judgment that its notice in the 2005 Letter was sufficient to terminate the Agreement on its December 31, 2007 expiration date. In turn, Mediacom asked that a declaratory judgment be entered establishing that the Agreement automatically renewed on

December 31, 2007, and continues in effect until December 31, 2013. Both parties consented to a bench trial, and the district court ultimately granted declaratory judgment in favor of Mediacom on KCRG's complaint. Applying Iowa law, the district court found that the face of the 2005 Letter did not express a definite intent to terminate the Agreement.

## II. *Discussion*

On appeal, KCRG asserts that its 2005 Letter was a sufficient notice of termination under Iowa law. According to KCRG, it clearly communicated to Mediacom on September 29, 2005, that Mediacom could only continue to retransmit KCRG's signal to Mediacom's customers after the expiration of the parties' current Agreement on December 31, 2007, if the parties reached a new agreement. Under the applicable statutory scheme, the only reasonable interpretation of KCRG's language was an intent to terminate the existing Agreement.

In response, Mediacom argues that the 2005 Letter only gave "notice" of KCRG's election of retransmission consent status. Mediacom contends that the second paragraph of the 2005 Letter does not indicate that KCRG was making an affirmative election regarding the status of the parties' existing Agreement or was putting Mediacom on "notice" of a decision to which consequences would attach; KCRG neither expressly nor implicitly stated that the "only way" for Mediacom to continue transmitting KCRG's signal would be to negotiate a new agreement.

Because this is a diversity action, we must apply Iowa law on the substantive question of whether the 2005 Letter constitutes a sufficient notice of termination. *St. Paul Fire & Marine Ins. Co. v. Compaq Computer Corp.*, 539 F.3d 809, 822 (8th Cir. 2008). "When the district court conducts a bench trial as it did here, we review the district court's fact finding for clear error, and we review legal conclusions and mixed questions of law and fact de novo." *Eckert v. Titan Tire Corp.*, 514 F.3d 801, 804 (8th Cir. 2008).

Under Iowa law, a notice of termination must contain an "expression of a definite intent to cancel or terminate."[4] *Laverty v. Hawkeye Sec. Ins. Co.*, 140 N.W.2d 83, 87 (Iowa 1966); *see also Morris Silverman Mgmt. Corp. v. Western Union Fin. Serv., Inc.*, 284 F. Supp. 2d 964, 974 (N.D. Ill. 2003) ("The general rule is that, to be effective, a notice terminating a contract must be clear and unequivocal.") (citing 17B C.J.S. Contracts § 446). A notice of termination need not include the words "breach" or "termination" to effectuate termination. *Gray*, 86 F.3d at 1479 (holding that, under Missouri law, buyer's letter to seller met the stock purchase agreement's criteria for notice of breach, as it "explicitly" stated the buyer's objection to the continuing payment of management fees to a third party, which was a clear breach under the agreement). "The focus is on whether the notice is sufficiently clear to apprise the other party of the action being taken." *Morris*, 284 F. Supp. 2d at 974 (citing *LA-Nev. Transit Co. v. Marathon Oil Co.*, 985 F.2d 797, 800 (5th Cir. 1993)).

In determining whether a clear and unequivocal termination has occurred, a court may consider "[t]he related conduct of the parties, including conduct between the giving of the notice and the actual date of termination." *Id.* (citing *Accu-Weather, Inc. v. Prospect Commc'n, Inc.*, 644 A.2d 1251, 1255 (Pa. Super. Ct. 1994); *Int'l Hobby Corp. v. Rivarossi S.P.A.*, 1998 WL 376053, at *6 (E.D. Pa. June 30, 1998), *aff'd by unpublished order*, 203 F.3d 817 (3d Cir. 1999); *Stovall v. Publishers Paper Co.*, 584 P.2d 1375, 1380 (Or. 1978); *Miller v. Crouse*, 506 P.2d 659, 664 (Ariz. Ct. App. 1973)). "Notice of termination is to be liberally construed, the true intent and purpose of the parties in the ordinary rules of trade being kept in mind." *Shain v.*

---

[4]Similarly, applying Missouri law, this court has stated that "a notice of termination must be 'clear, definite, unambiguous and unequivocal, and it properly may not be so characterized unless its meaning can be apprehended without explanation or argument' in order to be effective." *Gray v. Bicknell*, 86 F.3d 1472, 1479 (8th Cir. 1996) (quoting *Baker v. Mo. Nat'l Life Ins. Co.*, 372 S.W.2d 147, 152 (Mo. Ct. App. 1963)).

*Wash. Nat'l Ins. Co.*, 308 F.2d 611, 617 (8th Cir. 1962) (internal quotations and citation omitted).

The question before this court is whether the second paragraph of the 2005 Letter contains a definite intent to cancel or terminate the Agreement. Like the district court, we conclude that the 2005 Letter does not express a definite intent to terminate the Agreement. First, the subject of the 2005 Letter is "Retransmission Consent," indicating that the purpose of the letter was to advise Mediacom of its election of transmission consent status, not of its desire to terminate the Agreement.

Second, the first two sentences of the second paragraph simply state facts known to both parties: (1) that Mediacom currently carries KCRG pursuant to the Agreement and (2) that the Agreement is scheduled to expire on December 31, 2007. Thus, the third sentence is the only sentence that KCRG can rely on to argue that it expressed an intent to terminate the Agreement with Mediacom. We find the third sentence vague and indefinite, as it—at the most—merely states a desire on KCRG's part to negotiate a new bargain in light of the Agreement's scheduled expiration. The third sentence does not say that termination is, in fact, imminent; instead, it may be seen as an expression of KCRG's hope that the parties can amend the Agreement.

Third, even if we were to look past the face of the 2005 Letter to the related conduct of the parties, the parties' prior conduct demonstrates that they had previously amended the existing Agreement without terminating it. On May 5, 2003, Belford sent Phelan a list of proposed amendments. On July 16, 2004, Belford sent Phelan a letter, reiterating that the expiration date of the Agreement was December 31, 2007, and stating that Mediacom would like to "add a digital component" to the Agreement. At no time did either party treat these letters, which proposed amendments to the current Agreement, as "terminating" or "cancelling" the existing Agreement.

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____