137 Nev., Advance Opinion 8

IN THE SUPREME COURT OF THE STATE OF NEVADA

NEVADA STATE EDUCATION
ASSOCIATION; NATIONAL
EDUCATION ASSOCIATION; RUBEN
MURILLO, JR.; ROBERT BENSON;
DIANE DI ARCHANGEL; AND JASON
WYCKOFF,
Appellants,
vs.
CLARK COUNTY EDUCATION
ASSOCIATION; JOHN VELLARDITA;
AND VICTORIA COURTNEY,
Respondents.

No. 79208

FILED

MAR 04 2021

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY _____
CHIEF DEPUTY CLERK

Appeal from district court orders granting summary judgment in a union contract matter. Eighth Judicial District Court, Clark County; Kerry Louise Earley, Judge.

*Affirmed.*

Leonard Law, PC, and Debbie A. Leonard, Reno; Bredhoff & Kaiser, PLLC, and Robert Alexander and Georgina Catherine Yeomans, Washington, D.C., for Appellants.

Snell & Wilmer, LLP, and Kelly H. Dove, John S. Delikanakis, Bradley T. Austin, and Michael Paretti, Las Vegas; Snell & Wilmer, LLP, and Andrew M. Jacobs, Tucson, Arizona; Asher, Gittler & D'Alba, Ltd., and Joel A. D'Alba, Chicago, Illinois, for Respondents.

21-06306

BEFORE PARRAGUIRRE, STIGLICH and SILVER, JJ.

*OPINION*

By the Court, STIGLICH, J.:

The bylaws of national- and state-level unions are contractually binding on affiliated local unions unless and until the local union disaffiliates from the parent unions. The local and parent unions may also enter into other contracts that govern certain aspects of their relationship. In this dispute between a local teachers' union and its state and national affiliates, we conclude that the parent unions' bylaws, while binding, did not by their own terms control the important issue of the transmission of dues from the local to the state affiliate. Instead, the local union's obligation to transmit dues was the subject of a separate contract. That contract contained a provision expressly permitting either party to terminate it by giving timely notice. We hold that the local union validly terminated this contract pursuant to that provision and so was not contractually obligated to continue transmitting its members' dues to the state union. Based on this, and because the parent unions' remaining tort-based claims also fail, we affirm the district court's grant of summary judgment to the local union.

*BACKGROUND*

*The three unions' contractual relationship*

The Clark County Education Association (CCEA) is a local union representing teachers and other employees of the Clark County School District. The Nevada State Education Association (NSEA) is a statewide union whose members are teachers and other school district employees throughout Nevada. The National Education Association (NEA) is a national union that represents about three million teachers and other

education professionals throughout the United States. When this dispute began, these three unions had been affiliated for decades. Indeed, CCEA's bylaws required its members to join NSEA and NEA, and conversely, those unions' bylaws required members to join the appropriate local affiliate.

When a Clark County educator wished to become a union member, he or she would sign a Membership Enrollment Form. That form authorized the school district to deduct "professional dues" from the teacher's paycheck and to pay those dues to CCEA. The Membership Enrollment Form did not expressly state the amount of dues or which organizations' dues were included, but the long-standing practice was to deduct all three unions' dues and to transmit the lump sum to CCEA. Each organization set its own dues according to its own bylaws. The total dues for CCEA's members for the 2017-2018 school year were $810.50 per person, which constituted the sum total of the CCEA, NSEA, and NEA dues.

For decades before the instant dispute, CCEA would transmit to NSEA all of NSEA's and NEA's dues that it received. NSEA would, in turn, transmit NEA's portion of the dues to NEA. However, the parties vigorously dispute which contractual provision, if any, required CCEA to transmit dues. There are several overlapping possibilities.

First, there is section 2-9 of the NEA bylaws, entitled "Dues Transmittal and Enforcement Procedures." Section 2-9(a) states that "[s]tandards and contracts for transmitting dues shall be developed between the state affiliate and each local affiliate." Section 2-9(a) further states that "[l]ocal affiliates shall have the full responsibility for transmitting state and Association [i.e., NEA] dues to state affiliates on a contractual basis."[1]

---

[1]Analogous provisions govern the transmission of dues from each state affiliate to NEA.

Section 2-9(b) further provides that "[a] local shall transmit to a state affiliate . . . at least forty (40) percent of the Association dues receivable for the year by March 15 and at least seventy (70) percent of the Association dues receivable for the year by June 1." Section 2-9(b), however, does not provide an explicit deadline to transmit one hundred percent of the NEA dues and does not address the state affiliate's dues at all.

Next, there is the Dues Transmittal Agreement (DTA), which NSEA and CCEA entered into in 1979. The DTA designated CCEA as NSEA's agent "for the purpose of collecting and transmitting NSEA and NEA dues." It required CCEA to transmit those dues within ten working days after receiving them from the school district. The contract also provided that, should any amendment to the NSEA constitution or bylaws conflict with the DTA, the DTA would be automatically amended to reflect the amendment. Finally and crucially, the contract provided that it would "remain in force for each subsequent membership year unless terminated in writing by either party prior to September 1 of any NSEA membership year, or amended by mutual consent of both parties."

Twenty years after entering the DTA, NSEA and CCEA entered into a second contract called the Service Agreement. That agreement set forth extensive services NSEA would provide to CCEA, including political action training, liability insurance coverage, and certain grant funding. The Service Agreement prominently stated that the DTA, which was included in the Service Agreement as an appendix, was to be "continued without change." Like the DTA, the Service Agreement renewed automatically each September 1, unless either party provided timely notice of termination.[2]

---

[2]Unlike the DTA, the Service Agreement required thirty days' notice of termination before the September 1 renewal date.

Finally, NSEA's bylaws also reference dues transmittal. They provide that "NSEA shall affiliate a local association when it meets the following minimum standards," with a short list of prerequisites for affiliation. One such prerequisite, added in 2015, is to "[h]ave a dues transmittal contract with NSEA."

*The instant dispute*

In May 2017, CCEA notified NSEA that it wanted to terminate the existing Service Agreement and negotiate new terms. Although CCEA stated that time was of the essence, NSEA initially refused to negotiate before mid-September. In a July letter, CCEA reiterated its pressing need to renegotiate before the new school year began and clarified its position that the existing Service Agreement would expire at the end of August, with or without a new agreement in place.

In early August, CCEA wrote to NSEA a third time. Therein, CCEA stated that the Service Agreement "serve[d] as the dues transmittal contract" and that there would be no agreement in place to collect and transmit dues to NSEA after August 31. CCEA firmly and clearly stated that if NSEA wanted CCEA to continue collecting and transmitting dues, then NSEA would have to negotiate a new agreement.

No new agreement was forthcoming. The September 1 deadline came and went. However, the school district continued to deduct dues for all three unions from each union member's paycheck and transmit them to CCEA. CCEA kept the portion constituting its own dues, but placed the remainder—which it would previously have sent to NSEA—in an escrow account pending litigation. In turn, NSEA ceased providing CCEA with any of the services referred to in the Service Agreement.

SUPREME COURT
OF
NEVADA

(O) 1947A

CCEA promptly filed a declaratory judgment action, seeking a declaration that it had no obligation to transmit the money in escrow to NSEA. NSEA and NEA filed a separate action for declaratory and injunctive relief, in which they sought to have the dues in escrow disgorged to NSEA. They argued that CCEA failed to effectively terminate the DTA and was now in breach of that contract. They also argued that CCEA had breached both the NSEA and NEA bylaws. Alternatively, they argued that CCEA had unjustly enriched itself or committed conversion by retaining the members' dues. Finally, a small number of individual teachers joined NSEA and NEA, claiming that CCEA defrauded them by falsely promising to transmit their dues to NSEA. The teachers sought punitive damages. As the cases initiated by CCEA and by NSEA and NEA presented largely the same issues, the cases were consolidated.

In April 2018, the members of CCEA formally voted to disaffiliate from NSEA and NEA. CCEA, as a newly independent union, would collect $510 in annual dues per member. While this was a greater amount than CCEA's previous dues, it reflected the need to fund member services that NSEA or NEA previously provided. The school district then changed its payroll deduction to conform to CCEA's new dues, and CCEA stopped depositing money in the escrow account.

The district court disposed of this litigation with two summary judgment orders. First, in December 2018, the district court concluded that NSEA and NEA could not recover under the DTA. It found that "[t]he Service Agreement incorporates the [DTA]" and that the two documents formed "a single integrated agreement." It then concluded that CCEA's letters effectively terminated the agreements as of September 1, 2017. It is

Supreme Court
of
Nevada

(O) 1947A

6

not entirely clear from the order whether the district court based that conclusion on its finding that the two contracts formed a single agreement.

Second, in July 2019, the district court granted summary judgment to CCEA on all remaining claims. The district court concluded that, as a matter of law, NEA's and NSEA's bylaws were not contractually binding on CCEA. Therefore, CCEA had no contractual obligation to transmit dues other than that imposed by the DTA. The district court further concluded that NSEA and NEA had no property interest in the escrowed funds that could give rise to a claim for conversion or unjust enrichment. Finally, the district court granted summary judgment to CCEA on the fraud claim. While litigation was pending, CCEA offered to refund to the suing individual teachers *all* of their dues for the 2017-18 school year, including the dues paid to CCEA. The district court found that this offer negated the possibility of compensatory damages for fraud, and the teachers failed to establish any fact supporting punitive damages.

In conjunction with entering judgment for CCEA, the district court also ordered CCEA to return the escrowed funds to its members. This appeal followed. NSEA and NEA obtained a stay requiring CCEA to continue to hold the disputed funds in escrow pending this appeal.

## DISCUSSION

NSEA and NEA (Appellants) argue that they, not CCEA, were entitled to summary judgment. First, they argue that the DTA remained in effect and bound CCEA to transmit the disputed dues. Second, they argue that even if CCEA successfully terminated the DTA, CCEA nevertheless remained obligated to transmit dues under the NEA or NSEA bylaws. Next, they argue that if neither the DTA nor the bylaws require CCEA to transmit dues, the parent unions are still entitled to the disputed dues under a theory of unjust enrichment or conversion. Finally, the

individual teachers argue that the district court erred by improperly considering CCEA's offer to repay those teachers' dues in granting summary judgment on their fraud claim.

*Standard of review*

This court reviews a district court order granting or denying summary judgment de novo. *Wood v. Safeway, Inc.*, 121 Nev. 724, 729, 121 P.3d 1026, 1029 (2005). Summary judgment is warranted "when the pleadings, depositions, answers to interrogatories, admissions, and affidavits, if any, that are properly before the court demonstrate that no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law." *Id.* at 731, 121 P.3d at 1031. Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (adopted as Nevada law in *Wood*, 121 Nev. at 731-32, 121 P.3d at 1031). "[T]he pleadings and other proof must be construed in a light most favorable to the nonmoving party," and summary judgment must be reversed if such a construction shows that there is a genuine dispute as to a material fact. *Wood*, 121 Nev. at 732, 121 P.3d at 1031. This court reviews a district court's interpretation of a contract, a question of law, de novo. *Weddell v. H2O, Inc.*, 128 Nev. 94, 101, 271 P.3d 743, 748 (2012).

*CCEA effectively terminated the Dues Transmittal Agreement*

The first issue is whether CCEA effectively terminated the DTA. We hold that it did.

While Nevada has not explicitly addressed contract termination under such facts in a published opinion, it is generally understood that when either party has the power to unilaterally terminate the contract at

the end of each period, a party wishing to exercise that power must simply give "clear and unequivocal" notice of its intent to do so. *Cedar Rapids Television Co. v. MCC Iowa LLC*, 560 F.3d 734, 740 (8th Cir. 2009) (addressing whether, under Iowa law, a party's letter adequately constituted a notice of termination of contract); *Shannon v. Civil Serv. Emps. Ins. Union*, 337 P.2d 136, 139 (Cal. Dist. Ct. App. 1959) (if notice "clearly evinces an intent to terminate the contractual relationship of the parties, [that] is all that is required for termination at will"); *see Roberts v. Second Judicial Dist. Court*, 43 Nev. 332, 341, 185 P. 1067, 1069-70 (1920) (explaining that a notice to terminate a tenancy must be "plain and unequivocal in its terms, leaving no doubt as to the intention of the party giving it, so that the other party may safely act thereon" (internal quotation marks omitted)); 17B C.J.S. *Contracts* § 614 (2020) (recognizing that "[n]otice to terminate a contract must be clear and unambiguous" (footnote omitted)). There are no magic words required for termination; rather, the court should liberally construe notice, keeping in mind "the true intent and purpose of the parties." *Cedar Rapids*, 560 F.3d at 740 (quoting *Shain v. Wash. Nat'l Ins. Co.*, 308 F.2d 611, 617 (8th Cir. 1962)).

The parties do not contest this basic rule, but Appellants argue that CCEA only gave notice of its intent to terminate the Service Agreement, not the DTA. We disagree. While CCEA's first two letters arguably referred only to the Service Agreement, the August letter had the subject line "Final Notice: Contract for Dues Remittance" and stated:

> [T]here has not been a mutual agreement to modify the Agreement, and without mutual agreement, the terms and conditions of the Agreement will be null and void upon its expiration on August 31, 2017.
>
> . . . The Agreement serves as the dues transmittal contract . . . .

SUPREME COURT
OF
NEVADA

(O) 1947A

9

> *To be clear, when the current Agreement between CCEA and NSEA expires on August 31, 2017 there will not be a contract in place between the two organizations to collect and remit dues to NSEA.*

(Emphasis added.) This letter clearly states that after the current period expires, there will be no contract in place to collect and remit dues. Although CCEA referred to the Service Agreement, we find it impossible to read the letter without grasping that CCEA's "true intent and purpose" was to terminate the contract that governed dues transmittal. *See Cedar Rapids*, 560 F.3d at 740 (internal quotation marks omitted). Unlike the letter in *Cedar Rapids*, which merely expressed a desire to renegotiate before the contract renewed, *see id.*, CCEA's letter unequivocally stated that the contract *will* expire on August 31, and that no agreement would be in place after that time. NSEA's reliance on the fact that CCEA referred to the Service Agreement by name and did not use the words "Dues Transmittal Agreement" would trap CCEA into renewing a contract that it clearly intended to terminate. We decline to impose a magic-words requirement that the terminating party must refer to the specific contract by name where, as here, the party's intent is otherwise clear and unequivocal. Therefore, we hold that CCEA terminated the DTA.[3]

---

[3]We need not address whether the Service Agreement and DTA were a "single integrated agreement." CCEA argues they were, while NSEA and NEA argue they were not. We conclude that it makes no difference: CCEA clearly terminated the DTA whether or not it was part of the Service Agreement.

We are not swayed by Appellants' argument that the DTA ceased to be terminable after the 2015 amendments to NSEA's bylaws. In Appellants' view, that amendment required affiliated locals to maintain a valid dues transmittal contract at all times. So interpreted, this provision conflicts with the DTA section permitting unilateral termination, and therefore, that section would have to be stricken pursuant to the DTA's automatic-amendment provision. We disagree with Appellants' reading.[4] Article VIII of the NSEA bylaws governs affiliation. Article VIII, section 3 provides that "NSEA shall affiliate a local association when it meets the following minimum standards," including that the local must "[h]ave a dues transmittal contract with NSEA." Article VIII, Section 5 addresses CCEA's duties by providing that "NSEA local affiliates must" meet certain criteria, none of which regards transmitting dues. These sections clearly place no obligation on CCEA regarding dues, and section 3 only defines when NSEA can affiliate a local union. Therefore, these sections do not place a duty on a local to consistently maintain a dues transmittal contract, and no conflict exists between the NSEA bylaws and the DTA that would trigger the DTA's

---

[4]Appellants ask us to defer to NSEA's interpretation of its own governing documents. Such deference may be appropriate when a union is accused of violating its own constitution or bylaws. *See, e.g., Bldg. Material & Dump Truck Drivers, Local 420 v. Traweek*, 867 F.2d 500, 511 (9th Cir. 1989) (giving deference to the union's interpretation of its governing documents when a former officer sued it for breaching those documents). However, the policy of nonintervention that underlies such deference to union defendants, *see Local 334 v. United Ass'n of Journeymen*, 669 F.2d 129, 132 (3d Cir. 1982), does not counsel deference when a union plaintiff seeks to enforce compliance with its view of its bylaws via judicial intervention.

SUPREME COURT
OF
NEVADA

(O) 1947A

automatic amendment provision. CCEA therefore retained the ability to terminate the DTA according to its termination provision.[5]

*The NEA bylaws do not provide a basis for relief*

We turn next to Appellants' claim that CCEA breached NEA's bylaws by terminating the DTA and refusing to transmit dues after the DTA expired. As a preliminary matter, the district court erred by holding that the bylaws were not binding on CCEA after it terminated the Service Agreement and DTA. Nevada has long recognized that a union's "constitution amounts to a binding agreement between the union and its members," *Hickman v. Kline*, 71 Nev. 55, 69, 279 P.2d 662, 669 (1955), and a union's bylaws are similarly binding, *Gable v. Local Union No. 387 Int'l Ass'n of Bridge Workers*, 695 F. Supp. 1174, 1177 (N.D. Ga. 1988) (treating a union's bylaws as contract terms that were part of, or addendums to, a union's constitution and therefore seeing "no reason" to distinguish between the bylaws and the constitution as members were bound by both). The individual members are not the only parties to these agreements, however. It is well settled that the agreements also bind the local affiliated union. *See United Ass'n of Journeymen v. Local 334*, 452 U.S. 615, 620-22 (1981) (treating a union's constitution as a contract between labor organizations and recognizing that as "the prevailing state-law view"); *Harker v. McKissock*, 81 A.2d 480, 482-83 (N.J. 1951) (treating a union's constitution and laws as a contract "establish[ing] the rights of the association and the component unions and the individual members, in relation to one another");

---

[5]For the same reason that we conclude that CCEA retained the power to terminate the DTA, we also conclude that CCEA did not breach the NSEA bylaws. Given our conclusion, we need not reach CCEA's argument that NSEA's interpretation renders the DTA an impermissible perpetual contract under *Bell v. Leven*, 120 Nev. 388, 391, 90 P.3d 1286, 1288 (2004).

*Int'l Union of United Brewery Workers v. Becherer*, 67 A.2d 900, 901 (N.J. Super. Ct. App. Div. 1949) ("The relationship between a parent organization and a local union federated or affiliated with it is contractual and the terms of the contract are to be found in the constitution and by-laws of the parent organization."); *see also* 51 C.J.S. Labor Relations § 178 (December 2020 update) (providing that the rights and liabilities between a national and local union are governed by the contract that binds them). CCEA did not disaffiliate from NSEA and NEA until April 2018, and until then, it remained bound by its parent unions' bylaws.

Because the bylaws are a contract, we interpret them as we would any other contract. The goal of contract interpretation is to "discern the intent of the parties." *MMAWC, LLC v. Zion Wood Obi Wan Tr.*, 135 Nev. 275, 279, 448 P.3d 568, 572 (2019). "This court initially determines whether the 'language of the contract is clear and unambiguous; if it is, the contract will be enforced as written.'" *Am. First Fed. Credit Union v. Soro*, 131 Nev. 737, 739, 359 P.3d 105, 106 (2015) (quoting *Davis v. Beling*, 128 Nev. 301, 321, 278 P.3d 501, 515 (2012)). "A contract is ambiguous if its terms may reasonably be interpreted in more than one way, but ambiguity does not arise simply because the parties disagree on how to interpret their contract." *Galardi v. Naples Polaris, LLC*, 129 Nev. 306, 309, 301 P.3d 364, 366 (2013) (citation omitted). In particular, an interpretation is not reasonable if it makes any contract provisions meaningless, or if it leads to an absurd result. *See Washoe Cty. Sch. Dist. v. White*, 133 Nev. 301, 305, 396 P.3d 834, 839 (2017).

Section 2-9(a) of the NEA bylaws, entitled "Dues Transmittal and Enforcement Procedures," states that "[l]ocal affiliates [like CCEA] shall have the full responsibility for transmitting state and [NEA] dues to

SUPREME COURT
OF
NEVADA

(O) 1947A

state affiliates on a contractual basis. Standards and contracts for transmitting dues shall be developed between the state affiliate and each local affiliate." In our view, this language can only reasonably be read as reserving any obligations regarding the transmittal of dues to a separate contract. Because the Dues Transmittal and Enforcement Procedures *begin* by requiring the parties to set up a separate contract and state that the responsibility to transmit dues will be "on a contractual basis," we conclude that the parties intended that the separate contract should govern.

This interpretation gives a plausible meaning to every word of the bylaws. In particular, the language placing "full responsibility" on the local union to abide by its contract with the state affiliate is still operative. Because it closely mirrors language placing "full responsibility" on the state affiliate to abide by its contract with the national union, we read these clauses as ensuring that neither the state union nor the local union will be penalized for the other's breach—for example, if the local timely transmitted dues to the state union, but the state union failed to forward those dues to the national union. That is a reasonable provision to include in a multi-party agreement. In contrast, if we interpreted this language to directly obligate local unions to transmit dues, as Appellants urge, the words "contractual basis" would be left with no apparent meaning.

Appellants further urge that even if section 2-9(a) does not obligate CCEA to transmit dues, section 2-9(b) does. That section begins by stating that "[a] local shall transmit to a state affiliate . . . at least forty (40) percent of [NEA] dues receivable for the year by March 15 and at least seventy (70) percent of [NEA] dues receivable for the year by June 1." Read in total isolation, this provision's use of "shall" might appear to obligate the local to transmit certain percentages of dues by certain dates. But this

reading would lead to the absurd result that, in the absence of a separate contract, the bylaws themselves obligate the local to transmit only 70% of the national's dues each year—not the remaining 30%, and *none* of the state affiliate's dues, which would have to be transmitted on a volunteer basis, if at all. We cannot imagine that such a piecemeal result was "the intent of the parties." *See MMAWC*, 135 Nev. at 279, 448 P.3d at 572. Instead, we conclude that these provisions are best harmonized by reading section 2-9(b) as outlining the permissible terms of the separate contracts that section 2-9(a) requires. This is a reasonable interpretation of the language, and it is consistent with the terms of the actual DTA, which required CCEA to transmit one-twelfth of the annual dues each month.

Finally, we are unpersuaded by Appellants' argument that CCEA breached the bylaws by terminating the DTA. In Appellants' view, the bylaws imposed a continuing obligation on each local not only to negotiate a dues transmittal contract with the state affiliate, but to keep that contract in effect so long as the local remained affiliated with NEA. We find no textual basis in the bylaws for this interpretation. Further, Appellants' reading would render the termination clause in the DTA meaningless. Where the parties agree that a later-negotiated contract will govern a certain aspect of their relationship, and then further agree that either party may terminate that contract on timely notice, we must give effect to that choice.[6]

---

[6]We decline to speculate as to what the parties' obligations under the bylaws would be if the DTA had *not* contained an express termination clause and CCEA had simply repudiated that contract without any legal basis for doing so.

In summary, while the bylaws are indeed a contract—and the district court erred by holding they were not—we enforce those bylaws according to their terms. And ultimately, there is only one reasonable interpretation of the bylaws.[7] They required CCEA to work with NSEA to develop a contract governing the transmittal of dues. CCEA did that and thereby complied with the bylaws. Therefore, while we disagree with the district court's reasoning, we affirm its judgment. *See Saavedra-Sandoval v. Wal-Mart Stores, Inc.*, 126 Nev. 592, 599, 245 P.3d 1198, 1202 (2010).

*CCEA is not liable for unjust enrichment or conversion*

We turn next to Appellants' tort claims. The district court granted summary judgment for CCEA on Appellants' unjust enrichment and conversion claims because it found Appellants failed to show they had any property right in the disputed dues. We affirm, although again on slightly different grounds. *See id.*

"Conversion is 'a distinct act of dominion wrongfully exerted over another's personal property in denial of, or inconsistent with his title or rights therein . . . .'" *Evans v. Dean Witter Reynolds, Inc.*, 116 Nev. 598, 606, 5 P.3d 1043, 1048 (2000) (quoting *Wantz v. Redfield*, 74 Nev. 196, 198, 326 P.2d 413, 414 (1958)). Although conversion is not excused by mere good faith, *id.*, we have long held that where there is genuine doubt as to the rightful ownership of property, a party may properly "resort to the judicial process" to resolve that doubt, *Wantz*, 74 Nev. at 198, 326 P.2d at 414. For example, in *Wantz*, the defendant Redfield asserted a third-party claim

---

[7]Although we do not find the bylaws ambiguous, we must acknowledge that they are not a model of clarity. We take this opportunity to note that if we did find the bylaws ambiguous, we would "construe [that] ambiguity against the drafter," *MMAWC*, 135 Nev. at 279, 448 P.3d at 572, and would accordingly reach the same result.

under NRS 31.070 to certain property that Wantz had attached in a separate action. *Id.* at 197, 326 P.2d at 413-14. Redfield then took possession of the property pursuant to that statute. *Id.* at 197, 326 P.2d at 414. Ultimately, the district court determined that Redfield did not in fact own the property, and Wantz sued him for conversion. *Id.* This court held that Wantz had done nothing wrong. "In the absence of malice, which the record here does not reveal, it is not wrongful or tortious to engage in a dispute as to title nor to submit that dispute to the courts." *Id.* at 198, 326 P.2d at 414. We distinguished a California case where the claimant was held liable for conversion because "after taking possession, [it] had sold the property claimed and pocketed the proceeds of the sale." *Id.* at 199, 326 P.2d at 414 (citing *McGaffey Canning Co. v. Bank of Am.*, 294 P. 45 (Cal. Dist. Ct. App. 1930)). In contrast, Redfield had "done nothing other than to hold the property pending the outcome of the hearing." *Id.*

Although *Wantz* involved third-party claim statutes that are not at issue here, we do not think that is significant. A party does not exert wrongful dominion over property where it affirmatively submits a genuine dispute regarding the property to the courts and then appropriately holds the subject property pending the court's decision. That is especially true where, as here, the court determines that the party was never required to transmit the property to anyone else.[8] Of course, this rule would not apply

---

[8]To the extent Appellants argue that they have a property interest in the dues that is untethered to the contracts—which we have held do not require CCEA to transmit dues—we reject this argument. Appellants' claim that a portion of the dues was always "designated" as "NSEA and NEA dues" shows nothing more than Appellants' contractual expectation. A party that has a contractual expectation of payment cannot "duplicate[ ] [the] breach of contract claim" with a conversion claim. *Wechsler v. Hunt*

if the party's claim of right is made with "malice," *see id.* at 198, 326 P.2d at 414, or if the party improperly disposes of the property, *see id.* at 199, 326 P.2d at 414.[9] But here, we hold that CCEA did not commit conversion by retaining the disputed dues in an escrow account pending litigation.

The unjust enrichment claim fails for a similar reason. "Unjust enrichment exists when the plaintiff confers a benefit on the defendant, the defendant appreciates such benefit, and there is acceptance and retention by the defendant of such benefit under circumstances such that it would be inequitable for him to retain the benefit without payment of the value thereof." *Certified Fire Prot. Inc. v. Precision Constr. Inc.*, 128 Nev. 371, 381, 283 P.3d 250, 257 (2012) (internal quotation marks omitted). Here, to the extent that the dues constitute a "benefit," CCEA has only "retained" those dues pending the outcome of this litigation.[10] It is not inequitable for a party to place genuinely disputed funds in escrow while a court decides who is rightfully entitled to those funds.

---

*Health Sys., Ltd.*, 330 F. Supp. 2d 383, 431-32 (S.D.N.Y. 2004); *see also Giles v. Gen. Motors Acceptance Corp.*, 494 F.3d 865, 876 (9th Cir. 2007) (noting that duplicative remedies "add[] unnecessary complexity to the law" (internal quotation marks omitted)).

[9]The federal cases cited by Appellants are distinguishable on this ground. *See, e.g., WMCV Phase 3, LLC v. Shushok & McCoy, Inc.*, 750 F. Supp. 2d 1180, 1194-95 (D. Nev. 2010) (finding that a conversion claim was properly pleaded when the plaintiff alleged a collections agency fraudulently collected debt and did not remit the funds to the creditor).

[10]We note that Appellants are *not* arguing that they rendered any services and are owed the reasonable value thereof. *See Certified Fire*, 128 Nev. at 380-81, 283 P.3d at 256-57. Instead, the unjust enrichment claim is based on CCEA's retention of the dues themselves.

SUPREME COURT
OF
NEVADA

(O) 1947A

18

Therefore, because CCEA properly placed the dues in escrow awaiting judicial determination, and because the court correctly found CCEA was not required by any contract to transmit those dues, CCEA did not commit either conversion or unjust enrichment.

*The district court correctly granted summary judgment on the fraud claim*

We turn finally to the appellant teachers' fraud claim alleging that CCEA induced them to join the union, and to pay dues, by falsely representing that it would continue to transmit dues to NSEA. After litigation began, CCEA offered to return to those teachers not only their escrowed dues, but also the dues that they paid to CCEA itself. CCEA made this offer in light of its view that it was "not worth the Parties' time and the Court's resources to litigate over such a nominal amount." Finding that this offer negated any damages to support a fraud claim, the district court ordered CCEA to return the escrow funds to the teachers upon entering summary judgment for CCEA. It also found that the teachers had failed to establish any facts supporting punitive damages.

To prevail on a fraud claim, a plaintiff must prove five elements by clear and convincing evidence: (1) a false representation, (2) the defendant's knowledge or belief that the representation is false, (3) the defendant's intention to induce the plaintiff's reliance, (4) the plaintiff's justifiable reliance, and (5) damages. *Bulbman, Inc. v. Nev. Bell*, 108 Nev. 105, 110-11, 825 P.2d 588, 592 (1992). In general, punitive damages are available when the plaintiff shows "oppression, fraud or malice" by "clear and convincing evidence." NRS 42.005(1)(a).

Here, the district court erred by finding that CCEA's offer negated the element of damages. Generally, when a defendant offers to pay the *full* amount of a plaintiff's claim, the court should enter judgment for the plaintiff and against the defendant, even over the plaintiff's objections.

*See Radha Geismann, M.D., P.C. v. ZocDoc, Inc.*, 909 F.3d 534, 542-43 (2d Cir. 2018). But a court should not do so "unless the defendant surrenders to the *complete* relief sought by the plaintiff." *Id.* at 543 (internal quotation marks omitted). Anything less is nothing but a settlement offer that the plaintiff is free to reject. *See id.* at 541 (citing *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016)).

The language of CCEA's offer was unmistakably the language of settlement. It was not for the full amount that the teachers could have obtained if they prevailed because punitive damages and prejudgment interest were at least potentially available under NRS 42.005 and NRS 17.130(2), respectively.[11] Furthermore, if CCEA *had* offered complete relief, the district court should have enforced the offer by entering judgment for the teachers, not for CCEA. *See Geismann*, 909 F.3d at 542 (explaining that "where a defendant surrenders to 'complete relief' in satisfaction of a plaintiff's claims, the district court may enter default judgment *against the defendant*" (emphasis added)).

Although the district court erred by enforcing CCEA's settlement offer, we conclude that summary judgment was nevertheless warranted. In order to prevail on their fraud claim, the teachers must prove by clear and convincing evidence not only that CCEA made a false statement, but also that CCEA knew or believed that the statement was

_____

[11]The district court's order incorrectly suggests that the teachers would have had to prove additional facts supporting punitive damages beyond those required to prove fraud. NRS 42.005(1) (permitting punitive damages "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, *fraud*, or malice") (emphasis added); *see S.J. Amoroso Constr. Co. v. Lazovich & Lazovich*, 107 Nev. 294, 297, 810 P.2d 775, 777 (1991) (explaining that no "qualifying adjective" like "aggravated" is necessary to support punitive damages for fraud).

false. *Bulbman*, 108 Nev. at 110-11, 825 P.2d at 592. Accordingly, to withstand summary judgment, the teachers must produce evidence "sufficient to establish the existence" of those facts, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986), such that a "rational trier of fact could return a verdict" in their favor, *Wood v. Safeway, Inc.*, 121 Nev. 724, 731, 121 P.3d 1026, 1031 (2005). Even when we construe the teachers' evidence in the "light most favorable" to them, *id.* at 732, 121 P.3d at 1031, the teachers did not meet this burden of production.

The teachers allege that CCEA knew as early as May 2017 that it would stop transmitting dues in September 2017. The only evidence they rely on to support this, however, is CCEA's May letter stating it was terminating the Service Agreement with the intention of negotiating a successor agreement. The undisputed evidence shows that CCEA continued to seek to negotiate a new dues transmittal agreement at least through August. CCEA's letter does not support the inference that CCEA knew in May that it would stop transmitting dues after August. The teachers also allege that after August, at least one teacher was again told—by the president of CCEA—that his dues were "waiting to be sent to NSEA and NEA when a solution is reached with the contract." But although no solution was ultimately reached, no evidence suggests that CCEA's president's statement was intended to mislead at the time it was made.[12] The evidence certainly does not establish by clear and convincing evidence

---

[12]The fact that this litigation was already ongoing at that time does not show that CCEA did not intend to negotiate a new contract. CCEA's members would not vote to disaffiliate until April. Until then, CCEA would have known that it would have to eventually transmit dues in order to remain an affiliate in good standing.

that CCEA knowingly made a false statement. At best, substantial "speculation" is required. *See Wood*, 121 Nev. at 731, 121 P.3d at 1030 (internal quotation marks omitted).[13] Therefore, while the district court erred by relying on CCEA's settlement offer, it nevertheless reached the correct result, and we affirm. *See Saavedra-Sandoval*, 126 Nev. at 599, 245 P.3d at 1202.

## CONCLUSION

When unions are organized hierarchically, the parent unions' constitution and bylaws form a binding contract with the local union. Those contracts are enforced according to their terms, like any other contract. In this case, NEA's bylaws expressly reserved most of the local affiliate's obligation to transmit dues for a separate contract. CCEA validly terminated that contract and ended its obligation to transmit dues unless and until a new contract was negotiated. We also hold that CCEA did not commit unjust enrichment or conversion by not transmitting the dues. It lacked a contractual obligation to transmit the dues, was not otherwise obligated to transmit them, and properly placed the dues in escrow pending resolution of this dispute. Finally, we hold that an offer to repay a disputed

---

[13]To be clear, we reject CCEA's overbroad assertion that "self-serving" affidavits and declarations can *never* raise genuine issues of material fact. "Most affidavits are self-serving," *Wilson v. McRae's, Inc.*, 413 F.3d 692, 694 (7th Cir. 2005), and yet NRCP 56(c)(1)(A) expressly permits parties to rely on affidavits. The problem with the teachers' affidavits is not that they were self-serving, but that they failed to "set forth specific facts demonstrating the existence of a genuine factual issue." *Wood*, 121 Nev. at 731, 121 P.3d at 1030-31 (internal quotation marks omitted).

sum does not absolve a defendant of liability for fraud. Nevertheless, summary judgment was warranted here because appellant teachers did not produce evidence sufficient to support a finding that CCEA knowingly made a false statement. Accordingly, the judgment of the district court is affirmed.

_____, J.
Stiglich

We concur:

_____ J.
Parraguirre

_____, J.
Silver

SUPREME COURT
OF
NEVADA

(O) 1947A